IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,302

STATE OF KANSAS,
*Appellee*,

v.

DEAARION POTTS,
*Appellant*.

SYLLABUS BY THE COURT

1.

When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.

2.

There is nothing in the statutory language of K.S.A. 2012 Supp. 21-5807(a)(3) or K.S.A. 2012 Supp. 21-5801(a)(1) that restricts the scope of the burglary statute to situations in which the defendant steals or intends to steal something from the interior of a vehicle, as opposed to attempting to steal or actually stealing the vehicle itself.

3.

When a pretrial motion to suppress has been denied, the evidence must also be objected to at the time it is offered during the trial in order to preserve the issue for appeal.

1

4.

The adult certification process under the Juvenile Justice Code is a jurisdictional determination, rather than a sentencing question. Therefore, the judicial factfinding necessary to certify a juvenile for adult prosecution does not run afoul of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed 2d 435 (2000).

5.

A criminal sentence is effective when pronounced from the bench at the sentencing hearing; it does not derive its effectiveness from the journal entry. Therefore, a journal entry that imposes a sentence that varies from the sentence pronounced from the bench is erroneous and must be corrected to reflect the actual sentence imposed.

6.

A journal entry of judgment may be corrected "at any time" by a nunc pro tunc order. Nunc pro tunc orders are appropriate to correct clerical errors arising from oversight or omission.

7.

When the journal entry of judgment reflects the sentence that the district pronounced from the bench it cannot be corrected by a nunc pro tunc order.

Appeal from Wyandotte District Court; MICHAEL A. RUSSELL, judge. Opinion filed June 24, 2016. Convictions affirmed, sentences vacated in part, and case remanded with directions.

*Samuel Schirer*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

2

*Johnathan M. Grube*, assistant district attorney, argued the cause, and *Shawn M. Boyd*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.:  On the night of October 20, 2012, 15-year-old Deaarion Potts drove three acquaintances around Kansas City, Kansas, in a car that Potts stole earlier that day. During the excursion, Potts drove up behind a car and his three passengers proceeded to fire weapons at the vehicle, killing Ramon Bradley, one of the car's four occupants. As a result, Potts was charged with felony murder, criminal discharge of a firearm at an occupied vehicle, and burglary. After the district court authorized Potts to stand trial as an adult, a jury found him guilty of all three crimes. The district court imposed a controlling sentence of life without the possibility of parole for 20 years.

On appeal, Potts raises several arguments. First, he argues that because it was possible Bradley sustained his fatal gunshot wound during the initial moments of the shooting—when Potts claims he was not intending to aid his companions with the shooting—the State presented insufficient evidence to convict him of either felony murder or criminal discharge of a firearm. Potts also argues that in order for the State to have convicted him of burglary, it had to present evidence that he intended to steal something from within the car he broke into and stole. Because his conviction for burglary was based on his act of breaking into the car that he stole, he contends that his conviction must be reversed. Additionally, Potts argues that (1) his statements to police should have been suppressed because they were involuntary; (2) the district court's jury instruction on aiding and abetting was erroneous; (3) cumulative error deprived him of a fair trial; (4) the district court unconstitutionally enhanced his sentence by making factual findings that authorized the State to prosecute him as an adult; and (5) the district court

3

incorrectly noted within the journal entry of judgment that Potts was subject to lifetime postrelease supervision for all his convictions.

We reject his arguments and affirm his convictions and sentence. However, we conclude that while the district court properly sentenced Potts to lifetime parole for felony murder, the journal entry of judgment indicates that lifetime postrelease supervision was also imposed as a result of his convictions for burglary and criminal discharge of a firearm when only a maximum of 36 months is allowed. The State concedes the issue. Accordingly, we vacate only that portion of his sentence and remand for resentencing.

FACTS

During the late evening hours of October 20, 2012, Tracy Jordan and Eddie London drove Jordan's black Pontiac Grand Am to a community center located near Tenth Street and Washington Boulevard in Kansas City, Kansas, to pick up Jordan's brother, Charles Shelby, and his friend, Bradley, from a function that was ending. After picking them up, the group traveled eastbound on Washington Boulevard with the plan of going to the Power & Light District in downtown Kansas City, Missouri. Jordan drove; London sat in the front passenger seat; and Shelby and Bradley rode in the backseat.

Once the two eastbound lanes of Washington Boulevard pass Fourth Street, the lanes slowly curve south and eventually split, with the left lane exiting onto eastbound I-70 (taking travelers into Missouri). The right lane proceeds south and then makes a sharp curve to the east. At this point, the lane is called Minnesota Avenue; it travels a short distance east until meeting with Third Street. Proceeding directly east through the intersection of Third and Minnesota would cause a person to travel the wrong way on Fairfax Trafficway.

4

As the group traveled around the first curve on Washington Boulevard, preparing to take the exit for eastbound I-70, someone started firing multiple gunshots at them. Moments later, the rear window shattered. Jordan noticed that the gunfire was coming from a red car directly behind them. Jordan continued driving in the right lane, eventually going around the sharp curve and coming to the intersection of Third and Minnesota. He drove through the intersection, going the wrong way up Fairfax Trafficway. At that point, the red car stopped its pursuit and turned left on Third Street.

Sometime during the shooting, but after the rear window had been shot out, Shelby heard Bradley say, "I'm hit."

Due to the damage the car sustained, Jordan's Grand Am eventually came to a stop on Fairfax Trafficway. Shelby estimated that more than a minute had passed from the time he heard the first shot to the time the car stopped on Fairfax; London estimated 2 minutes had passed. Jordan got out of the car and waived down a truck driver, asking him to call the police. Police eventually responded to the scene and discovered that Bradley had died as a result of a single gunshot wound.

Police did not find any weapons or bullet casings inside the Grand Am. Police noted that the car had sustained several bullet holes, indicating that it was fired upon from behind.

During the investigation of the shooting, police scavenged the area on eastbound Washington Boulevard where the initial shots occurred and discovered bullet casings beginning just after the exit sign for Minnesota Avenue/Fairfax District. The sign noted that the exit—where traffic lines begin denoting separation of the two eastbound lanes— was 1/8-mile away. In this general area, police discovered a total of 31 shell casings—

5

nineteen 7.62x39 mm casings and twelve 9 mm casings. Near the intersection of Third and Minnesota—where the red car ended its pursuit—police found 20 shell casings—fourteen 7.62x39 mm casings and six 9 mm casings.

Police eventually found a red Dodge Intrepid parked in the middle of an alley near 25th and Garfield. The interior of the car was partially burnt. Someone had attempted to set the car on fire by igniting a gas can and placing it behind the front passenger seat. Police noted that the outer plate of the ignition switch was missing, indicating that someone had used a screwdriver to start the car. There were no weapons found inside, and there was no evidence that the car had sustained any gunshot damage. But police did find two 9 mm shell casings inside the car.

In all, police recovered 53 shell casings—thirty-three 7.62x39 mm casings and twenty 9 mm casings. Law enforcement determined that all 33 of the 7.62x39 mm casings were fired from the same gun. Of the twenty 9 mm casings recovered, 13 were fired from one gun, and seven were fired from another. In other words, three firearms were involved in the shooting—one firing 7.62x39 mm bullets and two firing 9 mm bullets.

A forensic scientist from the KBI testified that the most common firearm designed for 7.26x39 mm ammunition is an AK-47 rifle. In comparison, 9 mm ammunition is typically used in handguns. The scientist also estimated that an AK-47 without a shoulder stock is at least 26 inches long and that a shoulder stock generally adds another 8 to 10 inches in length. The scientist said that a 9 mm handgun is typically around 10 inches in length.

During Bradley's autopsy, a forensic pathologist recovered the fatal bullet. The forensic scientist examined the bullet. Though he could not determine its exact caliber,

the scientist stated that based on its characteristics, the bullet was "consistent with a rifle caliber rather than a handgun caliber."

A couple of days after the shooting, police learned that 16-year-old D'Andre Hill may have been involved in the shooting. On October 24, 2012, Hill, accompanied by his mother, spoke with police about the shooting. Hill told police that he and Deandre Harris (age 17) were at the Chelsea Apartment complex off Seventh Street when Potts (age 15) and Bobby Hale, Jr., (age 18 or 19) picked them up in a red car. As Potts drove, Hale sat in the front passenger seat, and Hill and Harris sat in the back seat.

According to Hill, as they traveled eastbound on Washington Boulevard, he heard Hale say, "There they go." Then, Hill heard a "boom" and realized that Hale was firing a rifle at a black car in front of them. Hill and Harris, who were armed with handguns, joined in and started firing their weapons at the car while Potts drove. As Potts followed the car down the Third Street exit, he drove into a curb or guardrail, but kept following the black car. Hill said that Potts stopped following the car once it drove through the intersection at Third and Minnesota and proceeded the wrong way on Fairfax Trafficway. Potts then turned left onto Third Street and drove away.

Hill said that no one discussed the shooting prior to it occurring.

On October 26, Potts, accompanied by his grandfather, came to the police station. After being advised of and waiving his *Miranda* rights, Potts spoke with two detectives. He told them that on the day of the shooting, he was walking by himself when he got tired and decided to steal a red Dodge Intrepid. He drove the car to an apartment complex off Seventh Street where he picked up Hale, Hill, and Harris. Hale sat in the front seat, Hill and Harris sat in the back seat. Potts told detectives that he was driving east on Washington Boulevard when he heard a "boom." He looked over and saw that Hale had

7

fired, in Potts' words, a "big gun" out the front passenger-side window at a car traveling in front of them. As Hale fired his weapon at the car, Potts said that he sped up and followed the car until it went down the wrong way of a one-way street. Afterwards, Potts drove his companions back to the apartment complex and dropped them off. He then parked the car and walked to his grandmother's house.

Potts told detectives that he did not realize anyone in the car was armed prior to the shooting.

After charging Potts in juvenile court with felony murder and criminal discharge of a firearm at an occupied vehicle, the State filed a motion seeking authorization to prosecute Potts as an adult pursuant to K.S.A. 2012 Supp. 38-2347. After conducting an evidentiary hearing, the district court granted the State's motion. The State filed an amended information charging Potts with the additional crimes of vehicular burglary and theft.

At Potts' jury trial, Hill testified for the State. Other than a few additional details, Hill's account of the shooting was similar to the account he gave to detectives. Hill again said that he and Harris were picked up at the apartment complex by Potts who was driving a red Dodge Intrepid. Hale sat in the front seat. Hill said that they left the apartment complex to buy cigars.

Hill indicated that somewhere around the area of Fifth and Washington, he heard Hale say, "There they go." Then he heard gunshots, looked up, and saw Hale firing an assault rifle out the front passenger-side window at a car. Hill said that he thought they were getting shot at, so he began shooting at the car with his handgun. Hill said that when they started shooting at the car, it was a couple of car lengths away.

8

Hill said that he and Harris were both armed with 9 mm handguns while Hale was armed with an assault rifle. Hill described Hale's gun as being long, estimating that it was 2 feet in length. Hill claimed that he did not know Harris and Hale were armed until the shooting occurred. Hill said that prior to the shooting, they had not discussed looking for a particular vehicle.

Hill said that as they were going around a curve, they hit a curb. Initially, Hill said that everyone stopped firing their weapons at this point. But later on cross-examination, Hill said that the shooting stopped once Potts turned left onto a street, presumably Third Street. Hill said that after the shooting, Potts drove them back to the Chelsea apartments where everyone got out of the car and left. Hill and Harris returned later and drove the car to an alley, set fire to it, and left. Hill said that after throwing his gun into a sewer, he returned to the apartment complex.

At the end of the State's case-in-chief, the district court granted Potts' motion for a directed verdict on the theft count due to the State failing to put on any evidence to establish the car's owner.

Potts presented the testimony of Dwight Alexander, an attorney who, at the request of defense counsel, timed how long it took to drive the portion of Washington Boulevard where the shooting took place. Alexander testified that the speed limit in that area is 30 miles per hour. Alexander said that going the speed limit, it took him 16.47 seconds to travel from the 1/8-mile exit sign for Minnesota Avenue/Fairfax District to the start of the exit for Minnesota Avenue/Fairfax District. From the exit sign to the stop sign at the intersection of Third Street and Minnesota Avenue, it took 39.27 seconds to travel that distance going the speed limit. Alexander noted that he had to slow down in order to negotiate the shape curve leading onto Minnesota Avenue.

9

The jury found Potts guilty of felony murder, criminal discharge of a firearm at an occupied vehicle, and burglary. More facts will be stated as they become pertinent to issues discussed below.

## FELONY MURDER AND CRIMINAL DISCHARGE OF A FIREARM

Potts argues that his convictions for felony murder and criminal discharge of a firearm at an occupied vehicle should be reversed because, according to him, the evidence was inconclusive as to whether he intended to aid his companions (particularly Hale) when they initially fired their weapons at the Grand Am. Potts contends that Hale, his front-seat passenger, started shooting at the Grand Am without any warning and that the bullet which killed Bradley was fired from Hale's gun. Potts claims that because it is possible Hale fired the fatal shot before he, Potts, acted in a manner which aided Hale and the others with the shooting (*i.e.*, speeding up in order to stay close to the Grand Am), the evidence was insufficient to convict him of either criminal discharge of a firearm or felony murder.

When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Frye*, 294 Kan. 364, 374–75, 277 P.3d 1091 (2012). An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *State v. McCaslin*, 291 Kan. 697, Syl. ¶ 8, 245 P.3d 1030 (2011). This court has also recognized that there is no distinction between direct and circumstantial evidence in terms of probative value. *State v. Evans*, 275 Kan. 95, 105, 62 P.3d 220 (2003). "A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference." *McCaslin*, 291 Kan. 697, Syl. ¶ 9.

Felony murder is the killing of a human being committed "in the commission of, attempt to commit, or flight from an inherently dangerous felony." K.S.A. 2012 Supp. 21-5402(a)(2). Criminal discharge of a firearm at an occupied vehicle is considered an inherently dangerous felony for purposes of applying the felony-murder rule. See K.S.A. 2012 Supp. 21-5402(c)(1)(O).

The district court instructed the jury that in order to convict Potts of criminal discharge of a firearm at an occupied vehicle, it had to find that Potts or another for whose conduct Potts was criminally responsible: (1) discharged a firearm at the Grand Am; (2) did so recklessly and without authority; (3) the Grand Am was occupied by a person, regardless of whether this was known by Potts or his companions at the time of the shooting; and (4) the shooting caused great bodily harm to Bradley. See K.S.A. 2012 Supp. 21-6308(a)(1)(B) and (b)(1)(B). In order to hold Potts criminally responsible for the conduct of his companions, the jury was instructed:

"A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime. All participants in a crime are equally responsible without regard to the extent of their participation. Mere association with the principles who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider and abettor."

We have repeatedly stated that if someone dies during the course of an inherently dangerous felony, such as criminal discharge of firearm at an occupied vehicle, "all the participants . . . [are] equally guilty of the felony murder, regardless of who fired the fatal shot." *State v. Thomas*, 239 Kan. 457, 462, 720 P.2d 1059 (1986). All participants in a felony murder are principals. See *State v. Littlejohn*, 260 Kan. 821, 822, 925 P.2d 839 (1996); *Thomas*, 239 Kan. at 462.

11

Potts' sufficiency argument fails to account for direct and circumstantial evidence that the jury could have relied on to conclude that he intended to aid his companions with the shooting at its very beginning. The jury was presented with evidence establishing that Potts stole a car prior to the shooting and that Hale—armed with an assault rifle that was at least 2 feet in length—got into the car and sat in the front passenger seat as Potts drove. After picking up Hill and Harris at the apartment complex, Potts drove the car east on Washington Boulevard. Hill's testimony indicated that somewhere around Fifth Street and Washington Boulevard, Hale said, "There they go," and then he started firing his weapon at the Grand Am. Hill and Harris soon joined in by firing their handguns at the car. Police discovered 31 shell casings (nineteen 7.62x39 mm casings and twelve 9 mm casings) on eastbound Washington Street beginning just past the 1/8-mile exit sign for Minnesota Avenue/Fairfax District, which is past the intersection of Fourth Street and Washington Boulevard.

Based on this evidence, the jury could have inferred that Potts stole the car for the purpose of acquiring transportation in order to commit the shooting. The fact that Hale got into the car and sat next to Potts while armed with an assault rifle (a weapon not easily concealed) supports this inference. Hale's statement of "There they go" indicates a prearranged plan to commit the shooting because the statement implies Potts would know that Hale was referring to the occupants of the Grand Am. Finally, instead of simply stopping the car or pulling over, Potts reacted to the initial shots by speeding up and following the Grand Am for a considerable distance, which included driving past an exit for I-70 and pursuing the car around a sharp curve leading onto Minnesota Avenue, thereby allowing his companions (based on the evidence collected near the intersection of Third and Minnesota) to fire their weapons 20 more times at the car. Accordingly, the State presented sufficient evidence to show that Potts, before and during the incident, intended to aid his companions with firing their weapons at the Grand Am. Because Ramon Bradley died as a result of the shooting, the evidence was also sufficient for the

12

jury to find Potts guilty of felony murder and criminal discharge of a firearm at an occupied vehicle.

Potts was convicted of burglary in violation of K.S.A. 2012 Supp. 21-5807(a)(3) based on his act of illegally entering and stealing the Dodge Intrepid that was used in the shooting. Potts contends that his conviction must be reversed because, according to him, an unauthorized entry into a vehicle with the intent to steal that very same vehicle is not criminalized by the burglary statute. Rather, the statute criminalizes the unauthorized entry into a vehicle with the intent to steal property located within the vehicle. Accordingly, Potts argues that because there was no evidence presented at trial that he entered the Dodge Intrepid with the intent to steal anything from within the vehicle, his conviction for vehicular burglary must be reversed.

Again, when the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *Frye*, 294 Kan. at 374-75. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *McCaslin*, 291 Kan. 697, Syl. ¶ 8. To the extent that Potts' argument requires interpretation of the burglary statute, this court exercises unlimited review. See *State v. Brooks*, 298 Kan. 672, 685, 317 P.3d 54 (2014).

K.S.A. 2012 Supp. 21-5807(a)(3) states in pertinent part that burglary is entering into vehicle without authority with intent to commit a theft "therein." Theft is defined in pertinent part as obtaining or exerting unauthorized control over property with the intent to permanently deprive the owner of the use or benefit of the property. K.S.A. 2012 Supp. 21-5801(a)(1). As the language of the burglary statute indicates, proof that the defendant completed a theft is not required for a conviction. Instead, the evidence must show that

13

the defendant illegally entered the vehicle with the intent to commit a theft therein. See *State v. Rush*, 18 Kan. App. 2d 694, 701, 859 P.2d 387 (1993), *rev'd on other grounds* 255 Kan. 672, 877 P.2d 386 (1994).

Potts argues that the legislature's use of the word "therein" (a word meaning "in or into that place or thing," see the Merriam Webster Dictionary [Online ed. 2016]) shows that the legislature intended to proscribe the act of entering a vehicle without authority for the purpose of stealing something from within the vehicle rather than entering the vehicle with the intent to steal the vehicle.

As Potts acknowledges, the Court of Appeals rejected this argument in *State v. Jones*, 29 Kan. App. 2d 936, 34 P.3d 82 (2001), *rev. denied* 273 Kan. 1038 (2002), but he argues that the court's reasoning for doing so ignored the language of K.S.A. 21-3715(c), the predecessor to K.S.A. 2012 Supp. 21-5807(a)(3). K.S.A. 21-3715(c) defined burglary as "knowingly and without authority entering into or remaining within any . . . motor vehicle . . . with intent to commit a felony, theft or sexual battery therein." Like Potts, the defendant in Jones argued that by including "therein" within the statutory definition of vehicular burglary, the legislature distinguished an intent to commit a theft within the vehicle (*i.e.*, stealing an item located inside the vehicle) from the intent to commit a theft of the vehicle. Accordingly, the defendant argued that he could not be convicted of burglary based on his act of entering a vehicle with the intent to steal it.

The *Jones* court construed the defendant's argument as essentially contending that "because the entry of the vehicle was a necessary part of the theft of the vehicle," the two crimes merged together, preventing his prosecution for both crimes. 29 Kan. App. 2d at 937. Rejecting this argument, the court reasoned that burglary and theft are separate crimes with distinct elements. "[T]he fact that one necessarily precedes the other does not demonstrate a merger of the offenses any more than a burglary of a house, although

14

necessary to the completion of some offense inside the house, merges with that offense upon its completion." *Jones*, 29 Kan. App. 2d at 939.

Admittedly, the *Jones* court failed to precisely address the defendant's argument regarding the impact of the word "therein" upon the *mens rea* element of vehicular burglary. But the court did touch upon the fact that burglary and theft are separate crimes and that if a person unlawfully enters a vehicle with the intent to commit a theft, he or she is guilty of burglary, regardless of the property the person intended to steal after entering the vehicle. There is nothing in the statutory language of K.S.A. 2012 Supp. 21-5807(a)(3) or K.S.A. 2012 Supp. 21-5801(a)(1) that restricts the scope of the burglary statute to situations in which the defendant steals or intends to steal something from the interior of a vehicle, as opposed to attempting to steal or actually stealing the vehicle itself. Simply stated, a person who illegally enters a car for the purpose of completing a theft—be it hotwiring a car or removing a car stereo—necessarily intends to commit a theft inside the vehicle (*i.e.*, therein) and may be properly convicted of vehicular burglary under K.S.A. 2012 Supp. 21-5807(a)(3).

Courts from other jurisdictions with similar vehicular burglary statutes have reached the same conclusion. In Illinois, where vehicular burglary is defined as a knowing entry without authority into "a motor vehicle . . . or any part thereof, with intent to commit therein a felony or theft," see 720 Ill. Comp. Stat. Ann. 5/19-1(a) (2014), the courts have rejected the same argument Potts makes in this case—that entry into a vehicle with the intent to steal the vehicle itself (as opposed to something "therein") does not constitute a burglary. See *People v. Buckner*, 203 Ill. App. 3d 525, 535, 561 N.E.2d 335 (1990) (noting that if the court adopted defendant's construction of vehicular burglary statute, "a person who entered a car to steal something from within would be punished for burglary but a person breaking in to steal the car itself would be guilty of theft only"); *People v. Mullinex*, 125 Ill. App. 3d 87, 89-91, 465 N.E.2d 135 (1984); *People v.*

15

*Sansone*, 94 Ill. App. 3d 271, 273-74, 418 N.E.2d 862 (1981). In Florida, where vehicular burglary is defined as an entry into "a structure or a conveyance with the intent to commit an offense therein," see Fla. Stat. Ann. § 810.02 (2007), the courts have also rejected the argument that the statute ought not to apply when the only intent is to steal the vehicle itself. See, *e.g.*, *State v. Stephens*, 601 So.2d 1195, 1196-97 (Fla. 1992) (The court noted that "therein" is synonymous with "in that place" and that use of the word "therein" within vehicular burglary statute "places no requirement that the crime must be one that can be completed solely within the fixed limits of that particular place, only that the crime is intended to be committed there. This obviously can include an intent to commit car theft, because such a crime can be committed 'in that place.'"). Accord *State v. Griffin*, 116 N.M. 689, 694, 866 P.2d 1156 (1993) (construing New Mexico's vehicular burglary statute and concluding that "[b]reaking into a car with the intent to steal the car qualifies as an intent to commit a theft 'therein'").

Potts does not dispute that the evidence presented at trial established he did not have permission to take the Dodge Intrepid. He simply argues that his act of illegally entering the car with the intent to steal the car is insufficient to sustain his conviction for vehicular burglary. Based on our construction of K.S.A. 2012 Supp. 21-5807(a)(3), we reject Potts' argument and affirm his conviction for vehicular burglary.

MOTION TO SUPPRESS

Next, Potts argues that the district court erred in failing to suppress his statements to police because his statements were involuntarily made. Potts acknowledges that he failed to object at trial when Detective Angela Garrison testified about Potts' statements to police. But he argues that notwithstanding the lack of a contemporaneous objection, this court should address the merits of this evidentiary issue in order to serve the ends of justice or to prevent the denial of fundamental rights. He also argues that judicial economy would be promoted by addressing the issue now rather than forcing him to file a

16

K.S.A. 60-1507 motion based on ineffective assistance of trial counsel for failing to object at trial.

We reject Potts' invitation to address this issue. In *State v. Houston*, 289 Kan. 252, 270, 213 P.3d 728 (2009), we stated:

> "[W]e hold that when a pretrial motion to suppress has been denied, the evidence must also be objected to at the time it is offered during the trial in order to preserve the issue for appeal. This holding is also consistent with the language in K.S.A. 60-404—objection to the evidence must be 'timely interposed'—and consistent with this court's longstanding characterization of the statutory language as requiring a 'contemporaneous' objection. Among other advantages, this holding allows a court to rule on the evidence before trial, but after hearing how the evidence unfolds during trial, allows the court to be prepared— after timely trial objection—to reconsider its original ruling."

Further, it should be noted that Potts' statements to police played a central role in his defense against the charges of felony murder and criminal discharge of a firearm at an occupied vehicle. Defense counsel performed an extensive cross-examination of Detective Garrison regarding Potts' statements to police. During this cross-examination, defense counsel was able to highlight for the jury Potts' statements indicating that he was not aware his companions were armed prior to the shooting; that the shooting was spontaneous, brief, and surprised him, and that as soon as he could, he stopped following the Grand Am by turning onto Third Street. Defense counsel used these statements in her closing argument to contend that Potts should not be found guilty of either criminal discharge of a firearm at an occupied vehicle or felony murder because he never intended to aid his friends with shooting at the Grand Am. Accordingly, defense counsel's failure to raise a contemporaneous objection during Garrison's testimony concerning Potts' statements may have been a strategic decision that will prove to be unchallengeable in a later K.S.A. 60-1507 motion raising ineffective assistance of counsel. See *Rowland v.*

17

*State*, 289 Kan. 1076, 1083-84, 219 P.3d 1212 (2009) (If counsel has made a strategic decision after making a thorough investigation of the law and the facts relevant to the realistically available options, then counsel's decision is virtually unchallengeable.). Consequently, Potts' judicial economy argument for why this court should address his unpreserved evidentiary issue on direct appeal is not persuasive.

We decline to address Potts' argument regarding the admission of his statements into evidence because he failed to preserve the issue for appellate review.

JURY INSTRUCTION ON AIDING AND ABETTING

Next, Potts argues that the district court's jury instruction on aiding and abetting was erroneous because it failed to clearly convey that Potts, in order to be found guilty of criminal discharge of a firearm at an occupied vehicle, needed to act intentionally in aiding Hale with shooting at the Grand Am. To remedy this, Potts contends that the statutory definition of intentional conduct should have accompanied the instruction on aiding and abetting culpability. See K.S.A. 2012 Supp. 21-5202(h) ("A person acts 'intentionally,' or 'with intent,' with respect to the nature of such person's conduct or to a result of such person's conduct when it is such person's conscious objective or desire to engage in the conduct or cause the result.").

Potts concedes that he did not request the instruction or object to the district court's jury instruction on aiding and abetting. Accordingly, review of this issue is controlled by K.S.A. 22-3414(3) and the stairstep analytical process set out in *State v. Herbel*, 296 Kan. 1101, Syl. ¶¶ 7-8, 299 P.3d 292 (2013), and *State v. Williams*, 295 Kan. 506, 511, 286 P.3d 195 (2012). As *Williams* articulated, K.S.A. 22-3413(3) creates a procedural hurdle when a party fails to object because the statute establishes a preservation rule for instruction claims on appeal. It provides, in part, that no party may assign as error a

18

district court's giving or failure to give a particular jury instruction, including a lesser included crime instruction, unless the giving or failure to give the instruction is clearly erroneous. If it is clearly erroneous, appellate review is not predicated upon an objection in the district court. *Williams*, 295 Kan. at 512-13.

To establish that the giving or failure to give an instruction was clearly erroneous, the reviewing court must determine whether there was any error at all. This requires demonstrating that giving the proposed instruction would have been both legally and factually appropriate, employing an unlimited review of the entire record. *Williams*, 295 Kan. at 515-16. And if error is found on that basis, then the court moves to a reversibility inquiry in which it assesses whether it is firmly convinced the jury would have reached a different verdict had the instruction been given. The defendant maintains the burden to establish the degree of prejudice necessary for reversal. 295 Kan. at 516.

The district court gave the following instruction (based on PIK Crim. 4th 52.140) regarding aiding and abetting culpability:

> "A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime. All participants in a crime are equally responsible without regard to the extent of their participation. Mere association with the principles who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider and abettor."

The language of the instruction conforms with K.S.A. 2012 Supp. 21-5210(a) ("A person is criminally responsible for a crime committed by another if such person, acting with the mental culpability required for the commission thereof, advises, hires, counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting the crime.").

19

In *State v. Llamas*, 298 Kan. 246, 311 P.3d 399 (2013), this court reviewed an aiding and abetting instruction based on PIK Crim. 3d 54.05—the predecessor to PIK Crim. 4th 52.140. The instruction stated:

> "'A person who, either before or during its commission, intentionally aids another to commit a crime with the intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the Defendant's participation, if any, in the actual commission of the crime.'" 298 Kan. at 258.

The district court denied the defendant's request in *Llamas* to add the following language to the instruction:

> "'[M]ere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider or abetter. To be guilty of aiding and abetting in the commission of the crime the defendant must willfully associate himself with the unlawful venture and willfully participate in it as he would something he wishes to bring about.'" 298 Kan. at 258.

On appeal, the defendant argued that the district court erred in refusing to give the additional language because the jury was left without direction regarding his defense (similar to Potts' defense) that he was merely present at the crime scene and did not assist an acquaintance with firing a gun at an occupied vehicle that resulted in a death. This court acknowledged that though the "mere association or presence" language was a correct statement of law, several of its prior decisions had concluded that the language of PIK Crim. 3d 54.05 "'clearly informs the jury that intentional acts by a defendant are necessary to sustain a conviction for aiding and abetting.'" 298 Kan. at 260. See, *e.g.*, *State v. Edwards*, 291 Kan. 532, 552, 243 P.3d 683 (2010) (["This court has repeatedly held that juries are presumed to intuit from the word 'intentionally' in the patterned

20

instruction that proof of mere association or presence would be insufficient to convict."). Consequently, the court concluded that though "[t]he better practice would be to include the mere association or presence language when a defense is based on the theory that a defendant was merely present and did not actively aid and abet a crime," the district court did not err by failing to do so. *Llamas*, 298 Kan. 261-62; see also *State v. Littlejohn*, 298 Kan. 632, 650-51, 316 P.3d 136 (2014) (reaching same conclusion).

The instruction at issue in this case gave a more extensive description of criminal liability based on aiding and abetting than the instruction at issue in *Llamas*. The first two sentences of the aiding and abetting instruction given in this case are substantially similar to the instruction at issue in *Llamas*—an instruction that the court determined "'clearly informs the jury that intentional acts by a defendant are necessary to sustain a conviction for aiding and abetting.'" 298 Kan. at 260. The requirement that the defendant act intentionally in order to find him or her criminally responsible for a crime committed by another is reinforced by the last sentence of the instruction at issue here: "Mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider or abettor."

The instruction as a whole clearly conveyed to the jury that a defendant, in order to be found guilty for a crime committed by another, must have intentionally aided in the commission of the crime. We conclude that it was not legally necessary for the district court to add the definition of intentional conduct *sua sponte* to the instruction it gave the jury on aiding and abetting liability. Based on the caselaw cited above, doing so would have been redundant.

CUMULATIVE ERROR

Potts next argues that cumulative error cost him a fair trial. Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction.

The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. *State v. Cosby*, 285 Kan. 230, Syl. ¶ 9, 169 P.3d 1128 (2007). Moreover, this doctrine does not apply if no error or only one error supports reversal. See *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009).

Based on the above analysis, none of the trial issues raised on appeal constitute error. Therefore, the court should not apply the cumulative error doctrine here

PROSECUTION AS AN ADULT

Potts also argues that when the district court made factual findings supporting its decision to authorize adult prosecution, it increased his potential punishment in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Potts acknowledges that he failed to raise this issue before the district court, but he notes that this court has addressed *Apprendi* issues for the first time on appeal. See *e.g.*, *State v. Gould*, 271 Kan. 394, 404-05, 23 P.3d 801 (2001); *cf. State v. Perez*, 292 Kan. 785, 261 P.3d 532 (2012) (refusing to address adult-certification *Apprendi* argument because defendant failed to comply with Supreme Court Rule 6.02 [2015 Kan. Ct. R. Annot. 41] by not explaining why issue should be considered for the first time on appeal). Whether the district court violated *Apprendi* by making factual findings authorizing Potts to stand trial as an adult raises a question of law subject to unlimited review. See *State v. Tyler*, 286 Kan. 1087, 191 P.3d 306 (2008).

Here, the district court, not a jury, found that the State could prosecute Potts as an adult under K.S.A. 2012 Supp. 38-2347. Potts contends that if he had been prosecuted as a juvenile, he would have faced approximately 8 years in a juvenile correctional facility, compared to the controlling hard-20 life sentence he received as the result of being tried

as an adult. Because the district court's approval of adult prosecution increased the maximum punishment Potts faced, and the determination was not tried before a jury and proven beyond a reasonable doubt, Potts claims his rights under the Sixth and Fourteenth Amendments to the United States Constitution—as interpreted by *Apprendi* and its progeny—were violated.

Potts concedes that this court has rejected this argument in several cases. See *Tyler*, 286 Kan. at 1096; *State v. Mays*, 277 Kan. 359, 367-68, 85 P.3d 1208 (2004); *State v. Kunellis*, 276 Kan. 461, 465, 78 P.3d 776 (2003); *State v. Jones*, 273 Kan. 756, 47 P.3d 783, *cert. denied* 537 U.S. 980 (2002). In *Jones*, we held that while *Apprendi* applies to the sentencing phase of a criminal proceeding after guilt has been determined, the case does not apply to an initial adult certification hearing because such a hearing addresses a "jurisdictional matter" meant to determine which court (juvenile or adult) will resolve the case. Thus *Apprendi*'s requirement of a jury determination is not required for a juvenile to be tried as an adult. 273 Kan. at 774-78.

This court affirmed *Jones'* reasoning in *Tyler*. Tyler argued that his *Apprendi* rights were violated when the district court made the factual findings necessary to allow his prosecution as an adult rather than as a juvenile. The *Tyler* court rejected this argument, reasoning that *Apprendi* forbids only the imposition of a sentence that exceeds the statutory maximum permitted by the facts required by the jury's finding of guilt. In other words, *Apprendi* still applies after the certification procedure sends a juvenile to adult court. *Tyler*, 286 Kan. at 1095-96.

Notably, "[t]he vast majority of courts have held that a judge's decision whether a juvenile should be prosecuted as an adult is a pre-adjudicatory question of jurisdiction and therefore does not implicate the Apprendi case line." Jenny E. Carroll, *Rethinking the Constitutional Criminal Procedure of Juvenile Transfer Hearings:  Apprendi, Adult*

23

*Punishment, and Adult Process*, 61 Hastings L.J. 175, 201 (2009). See, *e.g.*, *United States v. Miguel*, 338 F.3d 995, 1004 (9th Cir. 2003) ("*Apprendi* does not require that a jury find the facts that allow the transfer to district court. The transfer proceeding establishes the district court's jurisdiction over a defendant."); *United States v. Juvenile*, 228 F.3d 987, 990 (9th Cir. 2000) (holding that the transfer of a juvenile to an adult court "merely establishes a 'basis for district court jurisdiction'"); *State v. Kalmakoff*, 122 P.3d 224, 227 n.29 (Alaska App. 2005) (finding that the weight of authority indicates that transfer Fproceedings are mere determinations of the court's jurisdiction and therefore *Apprendi* protections do not apply); *State v. Rodriguez*, 205 Ariz. 392, 401 71 P.3d 919, 928 (Ariz. App. 2003) (holding that the state juvenile-transfer statute in question is not a sentence-enhancement scheme because "it does not subject [a] juvenile to enhanced punishment, it subjects [a] juvenile to the adult criminal justice system"); *People v. Beltran*, 327 Ill. App. 3d 685, 690-91, 765 N.E.2d 1071, 1076 (2002) (holding that transfer establishes jurisdiction and therefore is "dispositional, not adjudicatory"); *Caldwell v. Com.*, 133 S.W.3d 445, 452-53 (Ky. 2004) (adopting the argument that juvenile transfer is merely jurisdictional); *State v. Lopez*, 196 S.W.3d 872, 875-76 (Tex. App. 2006) (holding that a decision allowing "prosecution of a juvenile as an adult" only "involves the determination of which system will be appropriate for a juvenile offender").

Potts claims that *Tyler* was wrongly decided because the court focused on the jurisdictional nature of authorizing the State to prosecute a juvenile as an adult rather than the effect adult certification has on a juvenile, *i.e.*, subjecting him or her to the possibility of increased punishment. However, Potts' argument fails to acknowledge that the adult certification procedure takes place before a juvenile has been found guilty of committing any crime. In *Apprendi*, the Supreme Court held:  "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. But the Court cautioned that "the relevant inquiry is one not of form, but of

effect—does the required finding expose the defendant to a greater punishment than that *authorized by the jury's guilty verdict*?" (Emphasis added.) 530 U.S. at 494. Since *Apprendi*, the Court has never indicated or hinted that *Apprendi* would apply to a factual determination made at a pretrial proceeding. *Cf. Hurst v. Florida*, 577 U.S. \_\_, 136 S. Ct. 616, 621-22, 193 L. Ed. 2d 504 (2016) (concluding that Florida's capital sentencing scheme violates the Sixth Amendment because judicial fact finding exposes defendant to greater punishment [death] than the punishment authorized by jury's guilty verdict [life sentence]); *Alleyne v. United States*, 570 U.S. \_\_, 133 S. Ct. 2151, 2163, 186 L. Ed. 2d 314 (2013) (concluding that defendant's Sixth Amendment rights were violated when a judge made factual finding that increased defendant's mandatory minimum sentence resulting from jury's guilty verdict).

Based on the above, we affirm our holding in *Tyler* and conclude that Potts' Sixth Amendment rights were not violated when the district court made factual findings authorizing the State to prosecute Potts as an adult.

POSTRELEASE SUPERVISION

Finally, Potts argues that the district court erred by noting within the journal entry of judgment that Potts was subjected to lifetime postrelease supervision for all of his convictions. He argues that this court should order the preparation of a nunc pro tunc or amended journal entry of judgment to reflect that he is subject to lifetime parole for the felony-murder conviction and 36 months of postrelease supervision for the criminal discharge of a firearm and burglary convictions. The State concedes this issue.

A criminal sentence is effective when pronounced from the bench at the sentencing hearing; it does not derive its effectiveness from the journal entry. Therefore, a journal entry that imposes a sentence that varies from the sentence pronounced from the bench is erroneous and must be corrected to reflect the actual sentence imposed. *State v.*

25

*Mason*, 294 Kan. 675, 677, 279 P.3d 707 (2012); see also *State v. Mebane*, 278 Kan. 131, 136, 91 P.3d 1175 (2004) (explaining nunc pro tunc orders are appropriate to correct clerical errors arising from oversight or omission). A journal entry of judgment may be corrected "at any time" by a nunc pro tunc order. See K.S.A. 22-3504(2); *Mason*, 294 Kan. at 677.

Under K.S.A. 2012 Supp. 22-3717(b)(2), a person convicted of felony murder is "eligible for parole after serving 20 years of confinement without deduction of any good time credits." Under subsection (d)(1)(A), a person convicted of a nondrug severity level 3 crime (such as criminal discharge of a firearm resulting in great bodily harm, see K.S.A. 2012 Supp. 21-6308[b][1][B]) "must serve 36 months, plus the amount of good time and program credit earned and retained . . . on postrelease supervision." In addition, subsection (d)(1)(F) of K.S.A. 2012 Supp. 22-3717 states:

> "In cases where sentences for crimes from more than one severity level have been imposed, the offender shall serve the longest period of postrelease supervision as provided by this section available for any crime upon which sentence was imposed irrespective of the severity level of the crime. Supervision periods will not aggregate."

Thus the controlling term of postrelease supervision applicable to Potts' criminal discharge of a weapon and burglary convictions is 36 months. See K.S.A. 2012 Supp. 21-5807(c)(1)(C) (vehicular burglary is a nondrug severity level 9 crime).

At sentencing, the district court judge stated that for the felony-murder conviction, he was sentencing Potts to "a term of life without eligibility for parole until you have served twenty years." But shortly after announcing this sentence, the judge stated that "[p]ost-release will be life." With regard to the criminal discharge of a firearm conviction, the district judge indicated that he was imposing lifetime parole. For the burglary

conviction, the judge did not announce a term of postrelease supervision. The subsequently filed journal entry of judgment indicates that the judge imposed lifetime postrelease supervision for all three convictions.

It appears that the journal entry of judgment reflects, in part, the sentence that the district court pronounced from the bench at sentencing; thus it cannot be corrected by a nunc pro tunc order. *State v. Vanwey*, 262 Kan. 524, Syl. ¶ 2, 941 P.2d 365 (1997) ("A nunc pro tunc order under K.S.A. 22-3504[2] may only be used to correct actual clerical errors or errors arising from oversight or omission."). Instead of issuing a nunc pro tunc order, the appropriate remedy is to vacate the lifetime postrelease supervision period that the district court imposed and remand the case for resentencing with instructions that the district court impose lifetime parole for the felony-murder conviction and 36 months of postrelease supervision for the criminal discharge of a firearm and burglary convictions. See K.S.A. 22-3504(1) (an illegal sentence can be corrected at any time); *State v. LaBelle*, 290 Kan. 529, Syl. ¶ 1, 231 P.3d 1065 (2010) ("An illegal sentence is a sentence . . . which does not conform to the statutory provision, either in character or the term of the punishment authorized . . . .").

CONCLUSION

We affirm Potts' convictions and the accompanying prison sentences. But we vacate the lifetime postrelease supervision term that the district court imposed and remand with directions that the district court impose lifetime parole for the felony-murder conviction and 36 months of postrelease supervision for the criminal discharge of a firearm and burglary convictions.