NOT DESIGNATED FOR PUBLICATION

No. 124,390

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LANCE PAIGE SUTTON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Lyon District Court; JOHN E. SANDERS, judge. Opinion filed November 4, 2022.
Affirmed.

*Jennifer C. Bates*, of Kansas Appellate Defender Office, for appellant.

*Amy L. Aranda*, first assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before CLINE, P.J., ATCHESON and COBLE, JJ.

PER CURIAM: Following two men's uninvited entry into and removal of money from a home with three siblings inside, a jury convicted Lance Paige Sutton of aggravated burglary and aggravated robbery. A significant part of the State's evidence against Sutton was the eyewitness identification by the oldest of the siblings, R.D., despite that R.D.'s younger siblings, L.D. and S.D., did not specifically identify Sutton at the time of the crime. In this direct appeal, Sutton raises two issues: (1) the trial court failed to provide the cautionary eyewitness identification jury instruction, and (2) the trial court erred by admitting hearsay evidence over Sutton's objection. Finding no clear error

1

for the district court's failure to provide the cautionary instruction, and finding the evidentiary issue was not preserved for appeal, we affirm Sutton's convictions.

FACTUAL AND PROCEDURAL BACKGROUND

On the morning of October 28, 2020, R.D.—age 19—was home watching over his younger sister, L.D., and his younger brother, S.D., who were attending online school from home. Their parents were at work. S.D. was doing his schoolwork in the downstairs living room. L.D. was upstairs in the bathroom taking a shower. R.D. was in his upstairs bedroom asleep. Sometime between 10 a.m. and 11 a.m., S.D. heard knocking but saw no one at the door, so he went upstairs to wake R.D. R.D. checked but did not see anyone, so he went back upstairs to sleep, and S.D. went back downstairs. Soon thereafter, S.D. saw two men enter the house without being let in and proceed toward the stairs. S.D. heard one of the men say "'[n]ever mind'" and then both men left the house.

About five minutes later, S.D. observed the men return to the house and both went upstairs. S.D. saw two men on the stairs who were wearing hoodies and beanies. One man was skinny, and S.D. testified the other man was "in between" skinny and heavyset. S.D. testified he looked from the second living room to the stairs and when one man looked back at him, S.D. ran back into the first living room. The heavier set of the two men came downstairs, walked back and forth from the first to the second living room, and then exited the house. S.D. heard the other man knocking on his brother's door and heard yelling and mumbling. S.D. testified that the skinnier of the two men stayed upstairs for a longer time. S.D. later saw the skinnier man come downstairs and leave the house running. S.D. also testified that he saw the skinnier man try to hide a gun on his hip when he was leaving. S.D. testified that he only got a good look at the skinnier man and recalled the man had a scar on his face. S.D. identified the robber as Sutton during trial.

2

L.D. testified that at the time of the incident, she was in the upstairs bathroom taking a shower during a break from her schoolwork. After taking a shower, L.D. went back into her room to get dressed and closed her door. L.D. then heard someone yelling outside her room and saw someone in the doorway of R.D.'s room. L.D. only saw one person in the doorway, a black male who was wearing a dark blue sweater and a beanie, with a dreads or locks hairstyle. L.D. also testified that she saw the man had a gun, and when the man saw her, he tucked the gun into his waistline. L.D. went downstairs and saw a second man, wearing a dark hoodie, outside in the front yard looking "paranoid." L.D. went back upstairs, noticed R.D.'s door was locked, and heard screaming from inside the room. L.D. again went downstairs and proceeded outside to pretend to check the mail to see if the second man was still around, but he had left. While outside, L.D. then saw the man from upstairs leave the house in a hurry as he was tucking a gun in his waistband. L.D. testified she noticed that the man had a scar on his face.

R.D. testified at trial that he was asleep in his room when S.D. first knocked on his door and woke him up. R.D. went downstairs but did not see anybody. R.D. went back upstairs, closed the door, and lay down in bed. Soon after, R.D. heard another knock on his door, and when he opened the door, he saw two men standing outside his bedroom.

R.D. further testified that the two men were wearing sweats, hoodies, and beanies. R.D. described one of the men being heavy built and the other skinnier, and both men were about 6 feet tall and black. R.D. saw that the skinnier man standing about a foot away from him was holding a gun in his hand. R.D. recognized the heavier built man as a man named "Kenneth" (Kenneth Hopkins) because the man's brother was R.D.'s former classmate. R.D. testified that he did not know the taller man but was able to identify Sutton as the taller man at trial. R.D. also testified that Hopkins, the heavier-set man, did not come into his room.

3

R.D. testified that Sutton was standing about a foot in front of him with the gun pointed at his chest and was asking about a bag. Sutton then entered the bedroom and started searching through a cabinet. Sutton continued to have the gun pointed at R.D. and told him not to move or he would shoot him. Sutton then searched R.D.'s bed and found money under the blanket. R.D. testified that Sutton took $6,800 from the bed and ran out of the house. R.D. did not see where Sutton went after he ran from the house.

After Sutton left, R.D. checked to see if his sister and brother were okay and called his father. Once his father came home, they called the police. R.D. then went to the police department where he relayed what had happened. The officer provided R.D. a photo lineup at the police department and he picked Sutton from the lineup. The officer also provided L.D. the same photo lineup, but she could not identify Sutton and selected a different individual. Law enforcement did not present S.D. with the photo lineup.

At some point after the State charged Sutton with the crimes, he sent an apology letter addressed to R.D. to Lacey Douglas, who is a sister to both Sutton and Hopkins. R.D. then received messages from Douglas on Facebook, telling him she had something she needed to show him and asking him to come over to read the letter. Douglas contacted R.D. by video through Facebook to try to show him the letter. Although R.D. was able to see that Douglas had a letter, he could not read it through the video call. Douglas then read the letter aloud over the video call instead. R.D.'s parents were present during the video call and his father recorded the audio of the call on his cell phone.

Douglas testified during trial that sometime after Sutton's arrest, she received the letter from him. Douglas stated she contacted R.D. to diffuse any lingering anger because her family was being threatened. Douglas testified that she threw the letter away after reading it to R.D. She confirmed that she knew the letter was from Sutton because she recognized his handwriting. During his trial testimony, Sutton confirmed the letter was his but maintained his innocence. He said that he wrote that letter not to admit anything

4

but so that he could get himself and his brother out of jail. During trial, the court allowed the audio recording of Douglas reading the letter to be played for the jury over Sutton's objection.

The jury found Sutton guilty of aggravated burglary and aggravated robbery. The district court sentenced Sutton to 206 months' incarceration with 36 months of postrelease supervision, in addition to $6,550 in restitution and $238 in court costs and fees. Sutton timely appeals.

ANALYSIS

Sutton raises two issues in his direct appeal. First, he argues the trial court erred by failing to provide a cautionary jury instruction regarding eyewitness identification testimony. Second, he contends the trial court erred by admitting the audio recording of Douglas reading Sutton's letter over his objection, which he maintains was hearsay testimony. We address each issue in turn.

*The trial court did not commit clear error by failing to provide the eyewitness identification jury instruction.*

Sutton contends that the trial court erred when it failed to give the jury a cautionary instruction concerning the varying eyewitness identifications. All three siblings described the two intruders as black men wearing dark pants or sweats, dark hoodies, and beanies, with one man being skinner and one being heavier set. And, both S.D. and L.D. reported seeing a scar on the skinner man's face. But although R.D. identified Sutton in the photo lineup following the crime, L.D. identified another individual from the lineup. Because there was no physical evidence and the critical evidence connecting Sutton to the crime was the identification by R.D. and his siblings, Sutton argues the cautionary instruction was particularly important. The parties agree that

5

the instruction was not requested at trial and neither party objected to its omission during trial.

As noted by our Supreme Court in *State v. Shields*, 315 Kan. 814, 819, 511 P.3d 931 (2022):

> "Such a cautionary instruction is often prudent because although 'juries usually attach great weight to eyewitness identification' those in the legal profession know 'that such identification is often unreliable.' *State v. Hunt*, 275 Kan. 811, 818, 69 P.3d 571 (2003). A properly worded cautionary instruction alleviates some of that concern by providing the jury with factors to consider when evaluating the reliability of an eyewitness identification. See PIK Crim. 4th 51.110 (2020 Supp.) (instructing the jury on six factors affecting reliability)."

*Legal Standard*

If a party takes issue with the district court's failure to provide a specific jury instruction, the appellate court generally examines the question in three steps. First, we must decide whether we are precluded from deciding the issue due to a failure of preservation or lack of appellate jurisdiction. But Kansas law is clear that a party may raise a jury-instruction challenge for the first time on appeal under K.S.A. 2021 Supp. 22-3414(3) if the "failure to give an instruction is clearly erroneous." 315 Kan. at 819-20; see *State v. Butler*, 307 Kan. 831, 845, 416 P.3d 116 (2018). Here, the parties acknowledge that the instruction issue was not raised before the district court, so we must review this issue for clear error.

Our examination then advances to step two, which is to evaluate whether the proposed instruction was both legally and factually appropriate. *Shields*, 315 Kan. at 820. Even if the "requested instruction is legally and factually appropriate, we must also determine whether the instructions given by the district court, considered together as a

whole, properly and fairly stated the applicable law and were not reasonably likely to mislead the jury." 315 Kan. at 820 (citing *State v. Wimbley*, 313 Kan. 1029, 1035, 493 P.3d 951 [2021]). If the given instructions did so, the district court's failure to provide the omitted instruction does not equate to error. *Shields*, 315 Kan. at 820 (citing *State v. Potts*, 304 Kan. 687, 703-04, 374 P.3d 639 [2016]).

The final step in our analysis is to determine whether the district court's error requires reversal. Again, because Sutton failed to raise this issue before the district court, we review for clear error. See K.S.A. 2021 Supp. 22-3414(3). For the failure to give a jury instruction to be clearly erroneous, the appellate court must be firmly convinced the jury would have reached a different result if the omitted instruction had been given. 315 Kan. at 820-21. The party claiming clear error has the burden to show clear error. *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021); see K.S.A. 2021 Supp. 22-3414(3).

*Regardless of its appropriateness, the omission of the cautionary instruction was not clearly erroneous.*

The parties spend a significant portion of their arguments on whether the cautionary instruction was legally and factually appropriate, as required by the second step of our analysis. But, under the circumstances presented, it is unnecessary for this court to determine whether the cautionary instruction was legally or factually appropriate, because even providing Sutton the full benefit of both findings, the omission of the cautionary instruction by the trial court was not clearly erroneous.

To consider whether the omission of the cautionary instruction affected the outcome of the trial, we review the six factors of consideration provided in the instruction itself, PIK Crim. 4th 51.110 (2020 Supp.). This instruction provides:

> "The law places the burden upon the State to identify the defendant. The law does not require the defendant to prove (he) (she) has been wrongly identified. In

7

weighing the reliability of eyewitness identification testimony, you should determine whether any of the following factors existed and, if so, the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:

"1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting;

"2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;

"3. Whether the witness had observed the defendant(s) on earlier occasions;

"4. Whether a significant amount of time elapsed between the crime charged and any later identification;

"5. Whether the witness ever failed to identify the defendant(s) or made any inconsistent identification;

"6. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification." PIK Crim. 4th 51.110 (2020 Supp.).

A former additional factor in the instruction, addressing the certainty expressed by the witness, is no longer included. See *Mitchell,* 294 Kan. 469, 480-81, 275 P.3d 905 (2012) (noting conflicting scientific studies on whether an eyewitness' stated certainty about an identification correlates to its accuracy).

Sutton claims that the result of the trial *could have been* different because the testimony of the eyewitnesses supported many factors in the omitted instruction, PIK Crim. 4th 51.110. Yet Sutton does not fully explain how each factor would affect the accuracy of the eyewitness' identifications if the instruction had been provided, nor does he provide sufficient support to firmly convince us that the jury would have reached a different result. Sutton simply claims, in a conclusory fashion, that because the cautionary instruction was not provided the jury was not able to properly weigh and consider the identifications by R.D., L.D., or S.D.

The State argues that because the jury was provided all the testimony and the evidence of the photo lineup, there is no real possibility the jury would have reached a different result even if the cautionary eyewitness identification instruction were given. The State sufficiently detailed the trial testimony of R.D., L.D., and S.D. on appeal and explains how each person's testimony was reliable. The State concludes that there is no real possibility the jury would have reached a different result even if the instruction were provided.

On review of the record, we find the State's argument persuasive. Even without the cautionary instruction, many of the factors affecting the accuracy of eyewitness identifications, as highlighted in the omitted instruction, were presented to the jury in other ways. The features of each sibling's observations—such as their opportunities to observe the intruders, their separate locations, and their emotional states—were introduced through direct testimony, cross-examination, and counsel's arguments during trial. The jury heard each of the three siblings' testimonies, and Sutton had the opportunity to cross-examine the witnesses during trial. Sutton's closing argument at trial highlighted inconsistencies in the siblings' testimony, including their descriptions of the men who came into the house. Likewise, the State's closing arguments acknowledged and attempted to explain away those inconsistencies.

Additionally, the district court established several procedural safeguards against unreliable identification during trial. The district court provided a separate instruction to the jury concerning the weight and credibility to be given to the testimony of each witness. See *State v. Todd*, 299 Kan. 263, 272, 323 P.3d 829 (2014) (general instruction on witness credibility, along with other evidence of guilt, ameliorated omission of accomplice witness cautionary instruction). The trial court also instructed the jury that the burden to prove Sutton was guilty beyond a reasonable doubt remained with the State. See *State v. Marshall*, 294 Kan. 850, 869, 281 P.3d 1112 (2012) (identifying reasonable doubt instruction as procedural safeguard against unreliable identification).

9

For these reasons, we find Sutton has not met his burden to prove that the trial court committed clear error for failing to give an eyewitness identification cautionary instruction to the jury.

*Appellant's hearsay objection is not preserved for appeal.*

Next, Sutton argues that the trial court erred by admitting into evidence the audio recording of the video call in which Douglas read Sutton's letter to R.D. Sutton claims his trial counsel objected to the admission of the evidence as hearsay, and over his objection, the trial court ruled the audio recording was admissible under the declaration against interest exception to the hearsay rule, K.S.A. 2020 Supp. 60-460(j).

"'"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible" unless one or more statutory exceptions apply.'" *State v. Owens*, 314 Kan. 210, 221, 496 P.3d 902 (2021) (quoting K.S.A. 60-460). One of these exceptions is the declarations against interest exception, which is defined as:

> "a statement which the judge finds was at the time of the assertion so far contrary to the declarant's pecuniary or proprietary interest or so far subjected the declarant to civil or criminal liability or so far rendered invalid a claim by the declarant against another or created such risk of making the declarant an object of hatred, ridicule, or social disapproval in the community that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true." *State v. Sean*, 306 Kan. 963, Syl. ¶ 15, 399 P.3d 168 (2017).

During trial, Sutton objected to the admission of the audio recording on the basis that it lacked foundation (a basis he does not dispute on appeal) and that it was hearsay and did not fall under the statement against interest exception. At trial, defense counsel stated that "there appears to be some vague apology, but no confession. And so, absent a

10

statement against interests or confession that was attributed to my client, I believe that there is no hearsay exception that would allow the introduction of this recording." So, Sutton's position at trial was simply that the hearsay exceptions did not apply, because the letter was an apology, and not a statement against interest or confession.

Now, on appeal, Sutton asserts a different objection. Sutton now concedes the audio recording was a declaration against interest under K.S.A. 2020 Supp. 60-460(j), but he argues that the trial court committed error by admitting the audio recording because the statement was not made voluntarily and was not trustworthy, an exception addressed under another subsection of the hearsay evidence statute, K.S.A. 2020 Supp. 60-460(f). Sutton claims this was because he wrote the letter under threat of his family's safety and wanted to get out of jail. On review of the record, Sutton's objection made on appeal and the objection he raised at trial are not one and the same.

Under K.S.A. 60-404, an appellate court is precluded from reviewing an evidentiary challenge absent a timely and specific objection made on the record. *State v. Brown,* 307 Kan. 641, 645, 413 P.3d 783 (2018). "The purpose of this objection requirement is to allow the district court to act as an evidentiary gatekeeper at trial—to rule on the admissibility of evidence based on specific arguments raised at trial, with the context of other evidence and testimony presented." *State v. Bliss*, 61 Kan. App. 2d 76, 92, 498 P.3d 1220 (2021), *rev. denied* 314 Kan. 856 (2022). As a result, a party may not object at trial to the admission of evidence on one ground and then on appeal argue a different ground. *State v. Robinson*, 306 Kan. 1012, 1028-29, 399 P.3d 194 (2017).

Kansas law clearly defines the scope and manner of preservation of an objection to a trial court's ruling admitting or excluding evidence. Under K.S.A. 60-404: "A verdict or finding shall not be set aside . . . by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." Also, Kansas appellate caselaw has

11

consistently held that objections not raised on specific grounds at trial are not preserved for review upon appeal. *State v. Mattox*, 305 Kan. 1015, 1033, 390 P.3d 514 (2017).

Here, because of the manner in which Sutton presented his challenge to the trial court, the court did not have the opportunity to review the voluntariness or trustworthiness of the statement made by Sutton in his letter to Douglas. That objection was not posed to the trial court. Sutton only asked the court to determine whether the audio recording of the letter amounted to a statement against his own interest. Following the precedent of our Supreme Court, Sutton's hearsay objection claim challenging the trustworthiness of the statement may not be considered because this objection was not properly raised in the trial court.

As such, we must find Sutton's objection was not preserved for appeal and we are precluded from considering it. *Mattox*, 305 Kan. at 1033.

Affirmed.