IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,782

STATE OF KANSAS,
*Appellee*,

v.

SHAWN MALIK BROWN,
*Appellant*.

SYLLABUS BY THE COURT

1.

*Miranda* does not require that attorneys be producible on call, only that the suspect be informed he or she has the right to an attorney before and during questioning and that an attorney will be appointed for him or her if he or she cannot afford one. If the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless and until he or she waives his or her right to counsel.

2.

On the facts of this case, informing the defendant that an attorney would be appointed for him "if he was charged" did not render his *Miranda* warnings constitutionally inadequate because the warnings, in their totality, reasonably conveyed to the defendant his rights as required by *Miranda*.

3.

Property is in a person's presence if it is sufficiently within the person's control such that he or she could, if not overcome by violence or prevented by fear, retain possession of it.

1

4.

On the facts of this case, the evidence was sufficient to conclude that the victim's car, which was parked outside the victim's house, was so within the victim's control that he could have, if not overcome by violence inside the house, retained possession of it.

Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed September 15, 2017. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, argued the cause and was on the brief for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Marc Bennett,* district attorney, and *Derek Schmidt,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Shawn M. Brown directly appeals his convictions arising from his participation in two interconnected felony murders that were consolidated for trial in Sedgwick County. In one case, Brown was convicted of felony murder and aggravated robbery for shooting Adji Ibraham-Tampone in the back of the head and taking Tampone's Cadillac and cell phone because of a $1,000 drug debt Tampone owed. In the other case, Brown was convicted of felony murder, attempted aggravated robbery, and criminal discharge of a firearm under an aiding and abetting theory for driving his associates to and from the shooting of Shawn Rhone. The two homicides were tied together by Brown's involvement, drug-related violence, and shared evidence.

On appeal, Brown claims his statements to police should have been suppressed because a detective misinformed him about his *Miranda* right to counsel; the evidence was insufficient to support his convictions; and jury instruction errors warrant reversal of his convictions. However, we conclude the warnings given to Brown, in their totality,

2

reasonably conveyed Brown's right to counsel as required by *Miranda*; sufficient evidence supports his convictions; and the jury instructions are not clearly erroneous. Accordingly, we affirm Brown's convictions.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Adji Ibraham-Tampone Homicide*

In late 2012, Brown and his friend, Darius Smith, cooked and sold crack cocaine together. Smith ran the drug business from a motel room on South Broadway Street in Wichita. At that time, Tampone was attending Wichita State University and living off money that his father periodically sent him. Smith testified that Tampone was a daily customer and owed money to multiple drug dealers, including himself. Typically, Tampone paid Smith when he received money from his father.

Around November 2012, Tampone bought a gray 2003 Cadillac Deville with his father's money. He was proud of the car, drove it often, and did not loan it to others. However, Tampone was a spendthrift, and by December 27, 2012, he was broke and waiting for his father to send more money.

On December 30, 2012, Brown visited Smith's motel room. They smoked marijuana and showed each other their guns—Smith had a .22 caliber long barrel revolver and Brown had a .25 caliber small semiautomatic gun. As entertainment, Smith shot both guns at the corner of the wall to see which one was louder. Later that day, Brown left the motel with his gun.

On December 31, 2012, Brown was upset because Tampone stole $1,000 worth of crack cocaine from him. Smith testified that Brown then threatened to beat up and kill

3

Tampone. That same day, Brown posted a picture of Tampone's Cadillac on Facebook with a caption that read "new lac."

Tampone was last seen alive on New Year's Eve, 2012, when a neighbor observed him wearing a ball cap driving in the Cadillac with another male in the alley behind Tampone's house. That evening, Tampone and his friend, Dennis Haynes, had plans to go to a casino, but Tampone did not show up. Over the next day or two, Haynes called Tampone and stopped by his house a few times, but there was no answer. Haynes noticed that Tampone's curtains were drawn closed and his gray Cadillac was missing.

On January 1, 2013, Smith saw Brown driving Tampone's gray Cadillac. Brown talked about taking the Cadillac to a chop shop in Texas. When Smith cautioned that Tampone would surely call the police, Brown said Tampone gave him the car as collateral until he paid the drug money. When someone asked how Brown got the car, Brown replied that he "had to take care of business."

On January 3, 2013, Haynes noticed that Tampone's back gate was open, so he and his girlfriend entered the house through the back door. They found Tampone's dead body slouched in a lawn chair, with his ball cap and shoes lying on the floor. Tampone had a single gunshot wound in the back of his head, and it smelled as if he had been dead for a couple days. The house appeared to have been rummaged through, and Tampone's Cadillac was missing. The medical examiner concluded that the cause of Tampone's death was the gunshot wound to the back of his head.

The firearm toolmark examiner concluded that the same gun had fired the two .25 caliber bullets in evidence—one found lodged in Smith's motel room wall and one recovered from Tampone's brain. He explained the bullets could not have been fired from Smith's .22 caliber revolver, suggesting both were fired from Brown's .25 caliber gun.

4

However, it appears that the State never found Brown's gun because it was not entered into evidence at trial.

When detectives questioned Brown about the Cadillac and circumstances surrounding Tampone's death, Brown kept changing his story. First, Brown denied that he had a gray Cadillac or knew anyone with one. When confronted with the Facebook picture of his "new lac," Brown claimed it was not his. Next, Brown said he rented Tampone's Cadillac on New Year's Eve. Finally, Brown admitted that he went to Tampone's house on December 31, 2012, and took Tampone's clothing, cell phone, and Cadillac. However, Brown claimed Smith killed Tampone and gave the car and phone to him.

2. *Shawn Rhone Homicide*

We recently recited the basic facts of Shawn Rhone's homicide when we affirmed the conviction of Milo Brown, Brown's brother and accomplice, in a separate case. On January 2, 2013:

> "Shawn Rhone was at the Wichita home of his girlfriend, LaDonta Alford. Rhone left around 5:30 or 6 p.m. after having received a phone call. Before Rhone left, he told Alford '[t]hat he was going to go make a run.' Alford would testify at trial that this meant Rhone was leaving to sell someone marijuana, but she did not testify on whether she actually saw marijuana in Rhone's possession before he left her home. Rhone also received a text message containing an address on Northeast Parkway in Wichita.

> "Just after 7 that evening, Wichita Police Officer Charles Byers reported to his dispatcher that he had heard six gunshots while patrolling just east of Northeast Parkway. Two residents living on Northeast Parkway also reported hearing gunshots.

> "About that time, Carl Lemons, an off-duty police officer, was arriving at his part-time job as a security guard at a nearby QuikTrip. A customer came into the store

and told the clerk that a man in the parking lot had been shot. Lemons called 911 to report the shooting; Byers heard this call and drove to the QuikTrip.

"When Lemons emerged from the store, he found a man lying on the ground next to a car. The car's rear window and one of its taillights had been shot out. A cell phone was lying near the victim. Lemons asked the man a series of questions, but the man had difficulty communicating. He was able to tell Lemons . . . 'Parkway or Parkwood' and that his first name was Shawn. Investigators would later identify the man as Shawn Rhone.

"After emergency medical responders arrived on the scene, Rhone was transported to Wesley Medical Center, where he later died." *State v. Brown*, 303 Kan. 995, 996, 368 P.3d 1101 (2016).

Rhone had sustained one gunshot wound to his neck and another to his chest. The medical examiner concluded that the gunshot to the chest was the cause of Rhone's death.

Investigators observed multiple bullet holes in the back of Rhone's vehicle, bullet fragments inside the vehicle, and a spent cartridge casing on the front floorboard. However, they found no blood, drugs, or cash in Rhone's car. Officers also found shell casings and windshield glass fragments near 1757 Northeast Parkway. Firearm analysis indicated that at least two guns were fired at the scene.

Officers looked at Rhone's phone and found a text received shortly before 7 p.m. directing him to meet at 1757 Northeast Parkway. They determined that the number calling and texting Rhone's phone prior to the shooting belonged to Euva Brown, mother of three sons, Milo, Jerone, and the appellant, Shawn Brown. Ms. Brown said her kids mostly used that phone. When Ms. Brown was at the police department, Tampone's cell phone number called her phone. Tampone's number was listed in her phone under "Shiz," Shawn Brown's alias. Officers also discovered texts on Ms. Brown's phone to Shawn Brown at Tampone's number.

6

Ms. Brown recalled that on January 2, 2013, her three sons left the house in a gray Cadillac that Shawn was driving and arrived home around 10 p.m. However, Milo's movements were closely tracked that night—he was wearing a GPS ankle monitor because he was on parole. The GPS system located Milo around 1757 Northeast Parkway at the time of the shooting.

Brown initially denied knowing about the shooting. However, Brown later admitted that he dropped Milo and his cousin off at 1757 Northeast Parkway and then he and Jerone pulled around the corner. After shots were fired, Brown and Jerone picked the two up and drove away. Brown kept telling detectives that "he didn't know anybody was going to get robbed"—though detectives had not yet mentioned a robbery. Brown claimed the robbery was his cousin's idea and they planned to take "money and shit."

In the Tampone homicide, Brown was charged with felony murder and aggravated robbery. In the Rhone homicide, Brown was charged with felony murder, attempted aggravated robbery, and criminal discharge of a firearm. The two cases were consolidated for trial pursuant to K.S.A. 22-3203. The district court denied Brown's motion to suppress statements he made to detectives.

A jury found Brown guilty of all charges, and the district court denied Brown's motions for acquittal and a new trial. The court sentenced Brown to a total of two life sentences plus 228 months, to be served consecutively. Brown appealed directly to this court pursuant to K.S.A. 22-3601(b)(3) (direct appeal to Supreme Court when life sentence imposed).

ANALYSIS

1. *The district court properly denied Brown's motion to suppress his confession.*

Before trial, Brown moved to suppress all statements he made to Wichita police detectives January 3-8, 2013. The district court denied the motion, finding Brown received accurate *Miranda* warnings at the proper time and his statements to detectives were knowingly and voluntarily made. Brown renewed his objection at trial, preserving the issue for review. See *State v. Potts*, 304 Kan. 687, 700, 374 P.3d 639 (2016).

On appeal, Brown only takes issue with the interview by Detectives Robert Chisholm and Dan McFarren on January 7, 2013. Specifically, Brown claims all statements he made after asking when he would see a lawyer should be suppressed because Detective Chisholm misstated the law by saying Brown would be appointed a lawyer if he was charged with a crime. Brown argues that this misstatement communicated that Brown "had no right to counsel until charges were filed," violating *Miranda*.

Brown does not otherwise argue that his *Miranda* warnings were constitutionally deficient or his statements were not voluntarily, knowingly, or intelligently made. Thus, the precise question presented is whether Brown "was adequately informed of his right to the presence of appointed counsel prior to and during interrogation" in light of the detective's alleged misrepresentation of the law. *California v. Prysock*, 453 U.S. 355, 360, 101 S. Ct. 2806, 69 L. Ed. 2d 696 (1981). Because we conclude Detective Chisholm did not misstate the law and the warnings given, in their totality, satisfied *Miranda*, we affirm the denial of Brown's motion to suppress.

When reviewing a motion to suppress evidence,

"an appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. . . . Substantial evidence refers to evidence that a reasonable person could accept as being adequate to support a conclusion. . . . This court does not reweigh the evidence, assess the credibility of the witnesses, or resolve evidentiary conflicts. [Citations omitted.]" *State v. Mattox*, 305 Kan. 1015, 1035, 390 P.3d 514 (2017).

"The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during a custodial interrogation and the right to remain silent." *State v. Cosby*, 285 Kan. 230, 241, 169 P.3d 1128 (2007) (citing U.S. Const. amend. V; *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 [1966]). Due to the "'inherently compelling pressures' of custodial interrogation," *Maryland v. Shatzer*, 559 U.S. 98, 103, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010), "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination," *Miranda*, 384 U.S. at 444; see *State v. Schultz*, 289 Kan. 334, 342, 212 P.3d 150 (2009).

*Miranda* established the following procedural safeguards: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. Once a suspect invokes the Fifth Amendment right to counsel, the interrogation must cease, and "[q]uestioning can be resumed only after a lawyer has been made available or the suspect reinitiates conversation." *Cosby*, 285 Kan. at 242 (citing *Edwards v. Arizona*, 451 U.S. 477, 482, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 [1981], and *State v. Henry*, 273 Kan. 608, 613, 44 P.3d 466 [2002]). However, a defendant may waive his or her

9

Fifth Amendment rights as long as the waiver is voluntarily, knowingly, and intelligently made. *Miranda*, 384 U.S. at 444-45.

"The warnings required and the waiver . . . are, *in the absence of a fully effective equivalent*, prerequisites to the admissibility of any statement made by a defendant." (Emphasis added.) 384 U.S. at 476. Thus, no verbatim recitation or "talismanic incantation" is required to satisfy the *Miranda* rule. *Prysock*, 453 U.S. at 359-60. As the Supreme Court explained: "Reviewing courts . . . need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" *Duckworth v. Eagan*, 492 U.S. 195, 203, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989) (quoting *Prysock*, 453 U.S. at 361).

The district court held a motion to suppress hearing on January 17, 2014, where two detectives testified about their interviews with Brown. Detective Jason Bartel testified that he and Detective McFarren interviewed Brown six times on January 3, 2013. Detective Chisholm testified that he and Detective McFarren interviewed Brown on January 7, 2013. In between those dates, Brown was in custody. No one disputes that, at the time of the January 7, 2013, interview, Brown was subject to custodial interrogation because he was in the custody of the county jail and questioned as a suspect in both murders. See *Miranda*, 384 U.S. at 444.

The interview on January 7, 2013, began shortly before 4 p.m. and lasted 2-3 hours. Detective Chisholm recalled that Brown understood English and presented no signs of physical or mental impairment. Detectives Chisholm and McFarren started the interview by asking if Brown had used any substances, like alcohol, drugs, or medications. Brown responded that he had not done so since he was placed in jail. Then Detective McFarren read the Wichita Police Department's *Miranda* rights form to Brown. When Brown saw the form, he commented, "Yeah, I remember those."

10

Brown claims his statements should have been suppressed because of what happened next. When Detective Chisholm read the *Miranda* warning stating "you have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning," Brown responded, "When will I see one[?]" Detective Chisholm recalled:

> "I explained to Mr. Brown at that point that if he was charged with a crime, as the state of things are, how we work now, the protocol we have now, if he was charged with a crime he would then be appointed an attorney or he could hire an attorney.

> "He stated that he couldn't afford a lawyer. And I think I explained to him that he would have one appointed to him if he was charged with a crime."

However, the detectives clarified that if Brown decided to answer the questions now, without a lawyer present, he would still have the right to stop answering questions at any time. Brown stated he was willing to talk without an attorney present. Detective McFarren asked one by one if Brown understood his rights, and Brown said yes and signed the *Miranda* waiver form.

About halfway through the interview, Brown became upset and said he wanted to talk to an attorney. The exchange went as follows:

> "[Detective Chisholm:] At that point I believe he told us, you know, you don't have your facts straight, you know, I just—I don't want to talk to you any more, I want to talk to a lawyer. And I'm paraphrasing.

> "[The State:] All right. And then at that point what is your response when he mentions that he wants to talk to an attorney?

11

"[Detective Chisholm:] We told him that that was fine, that, you know, we were done. We were picking up our paperwork, I believe I explained to him that if he wanted to talk to us, just let us know, we'd get an officer and get him taken back over to the county jail.

"[The State:] What was Shawn Brown's response to you guys picking up your documents and leaving the room?

"[Detective Chisholm:] Well, I believe we left the room, I think we were out of the room and I believe he told someone else, another officer, that he wanted to talk to us. I stepped back into the room, Shawn Brown told me that Darius Smith was the one who had done this, who had killed Adji Tampone, that he wanted to talk to me.

"I explained, you know, well, you've asked for your attorney, but hold on a second, I need to get my paperwork and my notebook back. I left the room, would come back into the room and Mr. Brown told me that, you know, he wanted to talk to us. I explained again, well, you did ask for an attorney, are you willing to talk to us without an attorney, I think his answer was yeah, yeah, something along those lines. And then we continued with the interview."

On cross-examination, Detective Chisholm stated he told Brown he believed Brown would be charged the next day. He further explained, "[I]f Mr. Brown had an attorney or knew of an attorney he wanted to call, we would certainly do that for him. But as far as being able to get a court-appointed attorney, that is not something that usually occurs until after charges are filed." Brown was charged the next day on January 8, 2013.

During the January 7th interview, Brown said he rode with Tampone in the Cadillac to Tampone's house on December 31, 2013, but told conflicting accounts about how he acquired the Cadillac and phone. Brown first claimed he kept the Cadillac as collateral until Tampone could repay him for the crack cocaine he stole. However, he later alleged Smith killed Tampone with the .25 caliber gun, disposed of the gun in Mississippi, and gave Tampone's car and phone to Brown. At one point, Brown claimed

12

he could not have shot anyone because his hand was broken, though at various points during the interview he became upset and hit the table with both hands.

The district court denied the motion, finding that Brown "was given Miranda warnings at the appropriate time," and

> "[w]ith regard to the interview with Detective Chisholm, [Brown] was again given the Miranda warnings, went through each of the warnings. This issue about you only get a[n] appointed attorney after you're charged, still the Miranda warning tells him you don't have to talk, you can stop the interview at any time and if you want to get an attorney, that can be done. So I don't have difficulty with that, either."

Brown claims the district court's findings regarding his right to counsel warning did not accurately reflect the evidence presented at the hearing. However, we hold substantial competent evidence supports such findings.

We now turn to the lynchpin question of law—whether Brown was adequately informed of his right to the presence of appointed counsel prior to and during interrogation despite Detective Chisholm's statement that Brown would receive an appointed attorney "if he was charged." However, Brown's claim that he was misinformed about the law runs headlong into Supreme Court precedent that demonstrates otherwise.

In *Duckworth v. Eagan*, 492 U.S. 195, the Supreme Court considered a strikingly similar question—"whether informing a suspect that an attorney would be appointed for him 'if and when you go to court' renders *Miranda* warnings inadequate." 492 U.S. at 200-01. In totality, the defendant in *Duckworth* was warned that

> "he had the right to remain silent, that anything he said could be used against him in court, that he had the right to speak to an attorney before and during questioning, that he

13

had 'this right to the advice and presence of a lawyer even if [he could] not afford to hire one,' and that he had the 'right to stop answering at any time until [he] talked to a lawyer.' . . . As noted, the police also added that they could not provide respondent with a lawyer, but that one would be appointed 'if and when you go to court.'" 492 U.S. at 203.

The Court held the statement that a lawyer would be appointed "if and when you go to court" did not render the *Miranda* warnings inadequate because the warnings, "in their totality, satisfied *Miranda*." 492 U.S. at 205. In its analysis, the Court dispelled the myth that *Miranda* warnings must "be given in the exact form described in that decision." 492 U.S. at 202. Instead, the Court clarified, "The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" 492 U.S. at 203 (quoting *Prysock*, 453 U.S. at 361). Therefore, the Court concluded:

> "We think the initial warnings given to respondent touched all of the bases required by *Miranda*. . . . The Court of Appeals thought this 'if and when you go to court' language suggested that 'only those accused who can afford an attorney have the right to have one present before answering any questions,' and 'implie[d] that if the accused does not "go to court," *i.e.*[,] the government does not file charges, the accused is not entitled to [counsel] at all.' . . .

> "In our view, the Court of Appeals misapprehended the effect of the inclusion of 'if and when you go to court' language in *Miranda* warnings. First, this instruction accurately described the procedure for the appointment of counsel in Indiana. . . . We think it must be relatively commonplace for a suspect, after receiving *Miranda* warnings, to ask *when* he will obtain counsel. The 'if and when you go to court' advice simply anticipates that question. Second, *Miranda* does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one. The Court in *Miranda* emphasized that it was not suggesting that 'each police station must have a "station house lawyer" present at all times to advise prisoners.' 384 U.S., at 474. If the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless he waives his right to counsel. *Ibid.* Here, respondent did just that." *Duckworth*, 492 U.S. at 203-04.

14

*Duckworth* demonstrates that Detective Chisholm's statement to Brown that he would get an appointed lawyer "if he was charged with a crime" did not render the *Miranda* warnings inadequate. Like the defendant in *Duckworth*, Brown was informed that "he ha[d] the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one," as *Miranda* requires. 492 U.S. at 203. The detective's statement about the *timing* of such appointment was not a misstatement of law but a factual answer to Brown's direct question, "When will I see one[?]"

Thus, pursuant to *Duckworth*, Detective Chisholm did not taint the comprehensive *Miranda* warnings given to Brown by informing him that he would receive appointed counsel if he was charged with a crime. Indeed, *Duckworth* is clear that "*Miranda* does not require that attorneys be producible on call" to protect the right to counsel. When, as here, adequate *Miranda* warnings are given but "the police cannot provide appointed counsel," then "*Miranda* requires only that the police not question a suspect unless he waives his right to counsel." 492 U.S. at 204. And, like Duckworth, Brown did just that.

In their totality, the warnings given to Brown reasonably conveyed his right to counsel as required by *Miranda*, a right which he subsequently invoked during the interrogation. Therefore, the district court was correct as a matter of law that Brown was adequately informed of his right to counsel under *Miranda*.

Brown also perfunctorily argues that the January 7, 2013, interrogation was tainted because Brown suffered unnecessary delay between his January 3, 2013, arrest and his January 8, 2013, first appearance and appointment of counsel. See K.S.A. 22-2901 (requiring that "the person arrested shall be taken without unnecessary delay before a magistrate"). However, he raises this argument for the first time on appeal without citing a preservation exception and fails to support it with pertinent authority. Therefore, we

15

decline to entertain this argument on appeal. See *Mid-Continent Specialists, Inc. v. Capital Homes,* 279 Kan. 178, Syl. ¶ 4, 106 P.3d 483 (2005) ("Simply pressing a point without pertinent authority . . . is akin to failing to brief an issue. Where the appellant fails to brief an issue, that issue is waived or abandoned."); *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015) ("[A]n exception must be invoked by the party asserting the claim for the first time on appeal."); Supreme Court Rule 6.02(a)(5) (2017 Kan. S. Ct. R. 34).

Finding no error, we affirm the district court's denial of Brown's motion to suppress.

2. *The evidence was sufficient to support Brown's convictions.*

Regarding the Tampone homicide, Brown argues the evidence was insufficient to convict him of felony murder based on aggravated robbery because the State offered no proof that (1) Brown was armed with a dangerous weapon; (2) property was taken from the "presence" of Tampone; and (3) Brown had the requisite intent to commit aggravated robbery. However, aggravated robbery can be committed by one who either "is armed with a dangerous weapon" or "inflicts bodily harm on any person in the course of such robbery." K.S.A. 2012 Supp. 21-5420. Because the jury convicted Brown exclusively of the "inflicts bodily harm" means of aggravated robbery, Brown's first argument is meritless. Turning to his remaining claims, we conclude the State presented sufficient evidence for a reasonable jury to find beyond a reasonable doubt that Brown knowingly took Tampone's cell phone and Cadillac from his presence by force.

Our standard of review for sufficiency challenges is well-established:

"When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational

16

factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses." *Potts*, 304 Kan. 687, Syl. ¶ 1.

Furthermore, "[a] conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference." *State v. Rosa*, 304 Kan. 429, Syl. ¶ 2, 371 P.3d 915 (2016). However, to the extent we must interpret and apply a statutory definition, our review is unlimited. 304 Kan. at 433.

A challenge to the sufficiency of the evidence in a criminal case amounts to a posttrial claim that the State failed to meet its burden to prove each essential element of the charges. *State v. Logsdon*, 304 Kan. 3, 21, 371 P.3d 836 (2016). Here, the charge of felony murder required the State to prove that Brown killed Tampone while committing an aggravated robbery. See K.S.A. 2012 Supp. 21-5402(a)(2); K.S.A. 2012 Supp. 21-5402(c)(1)(D). As illustrated by the jury instructions, the charge of aggravated robbery required the State to prove:

> "1. The defendant knowingly took property from the presence of Adji Ibraham-Tampone;
> "2. The taking was by force;
> "3. The Defendant inflicted bodily harm on any person in the course of such conduct; and
> "4. This act occurred on or between the 31st day of December 2012, and 3rd day of January 2013, in Sedgwick County, Kansas.
> "A defendant acts knowingly when the defendant is aware of the nature of his conduct that the State complains about. "

See K.S.A. 2012 Supp. 21-5420; K.S.A. 2012 Supp. 21-5202(i).

Brown argues the State failed to prove that Brown knowingly took property from the "presence" of Tampone, as required for aggravated robbery, and thereby failed to prove felony murder. He claims, "The evidence at trial was that the Cadillac was outside Mr. Tampone's house . . . nowhere near the presence of Mr. Tampone's body" and "Mr. Tampone was in no position to prevent the taking of a vehicle that was parked outside of the house." And, Brown adds, there was no evidence regarding when or how the cell phone was taken. Thus, the Cadillac and phone could not have been taken from Tampone's "presence."

However, we have defined the "presence" element of aggravated robbery to include instances where violence or intimidation prevents the victim from retaining possession or control over his or her property—even if it is outside the victim's immediate proximity. We have long defined "presence" for aggravated robbery purposes as:

> "[A] possession or control so immediate that violence or intimidation is essential to sunder it. A thing is in the presence of a person with respect to robbery, which is so within his control that he could, if not overcome by violence or prevented by fear, retain his possession of it." *State v. Glymph*, 222 Kan. 73, 74-75, 563 P.2d 422 (1977).

According to this definition, physical proximity is not determinative of presence, as Brown insists. Instead, as *Glymph* explains, our definition has been applied widely by sister states to circumstances where the taking occurred "outside the victim's immediate vicinity," such as:

> "[W]here the victim was forced at gunpoint into a ladies' room; where the victim was locked in a vault; where the victims were placed in a freezer at a supermarket; where the victim was left tied in one room while the taking occurred in other portions of the building; where the victim ran from the store and was outside during the taking; and

18

where the victim, a gasoline station operator, was forced to drive away in his car and did not observe the taking of money from the cash register." 222 Kan. at 75.

Our caselaw follows suit. In *Glymph*, a store manager was forcibly prevented from protecting the property within his control when the defendant accosted him behind the counter, threatened him with a gun, and confined him to a shed outside the store. We held such facts "clearly constitute aggravated robbery." 222 Kan. at 75. Similarly in *State v. Evans*, 251 Kan. 132, 134, 834 P.2d 335 (1992), the defendant hit the victim on the head, tied her up in one room of the apartment, and stole money from another room. The defendant likewise claimed the taking did not occur in the victim's presence—we found "no merit" to this argument. 251 Kan. at 137; see *State v. Pham*, 281 Kan. 1227, 1248, 136 P.3d 919 (2006) (holding the "presence" element of aggravated robbery was met where the defendant tied the family up in the living room and took jewelry from the bedroom).

A case from the California Supreme Court is also instructive here. In *People v. Webster*, 54 Cal. 3d 411, 439, 285 Cal. Rptr. 31, 814 P.2d 1273 (1991), the defendant claimed the evidence of robbery was insufficient because the car was not taken from the victim's "'person or immediate presence,'" according to California's definition of robbery. See Cal. Penal Code § 211 (defining robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear"). The defendant and his accomplices walked with the victim to a campsite about a quarter of a mile away from the victim's car and killed him there. Afterwards, the group used the victim's keys to steal his vehicle.

The California Supreme Court had previously adopted a definition of "presence" akin to *Glymph*'s. See 54 Cal. 3d at 440 (stating, "'[a] thing is in the [immediate] presence of a person, in respect to robbery, which is so within his reach, inspection, observation, or control, that he could, if not overcome by violence or prevented by fear, retain his

19

possession of it'"). The court discerned that the distance between the victim and his car was not so great that he could not resist an attempt to seize it. 54 Cal. 3d at 440. Consequently, the court held, "The jury could thus reasonably infer that but for defendant's attack, [the victim's] relative proximity to the car would have allowed him to take effective physical steps to retain control of the vehicle, and to prevent defendant and his companions from stealing it." 54 Cal. 3d at 440. To hold otherwise would suggest that "criminals may escape robbery convictions simply by luring their victim far enough away from the property to make his control more difficult or the application of force or fear more convenient." 54 Cal. 3d at 441.

The California Supreme Court also looked to the victim's missing car keys as an indication that the car was taken from the victim's "person or immediate presence." The victim was found with his pant pockets turned out and the key missing. Thus, the court reasoned, a jury could reasonably infer that the defendant obtained the key by killing the victim, which was sufficient to convict for robbery. 54 Cal. 3d at 442.

These cases demonstrate that, viewing the evidence in the light most favorable to the State, the jury heard sufficient evidence to reasonably conclude Brown knowingly took the cell phone and Cadillac from the presence of Tampone by using lethal force. Indeed, the evidence presented and common experience strongly suggest that Tampone's phone and Cadillac were so within his control that he could have, if not overcome by violence, retained his possession of them. See *Glymph*, 222 Kan. at 74-75.

First, the jury learned from multiple sources—Smith, Brown's mother, and Brown himself—that Brown possessed Tampone's Cadillac on and after December 31, 2012. For example, Smith and Ms. Brown saw Brown driving Tampone's Cadillac after December 31, 2012, the day Brown posted a picture of Tampone's Cadillac on Facebook with a caption that read "new lac." Furthermore, between December 31, 2012, and January 2, 2013, Smith saw Brown with Tampone's cell phone, and Ms. Brown's cell phone received

20

calls and texts from Tampone's number, which was listed under Brown's contact information. Finally, Brown admitted to detectives that he took the phone and Cadillac from Tampone's house on December 31, 2012.

Second, the State presented sufficient evidence that Brown knowingly obtained the Cadillac and phone by lethal force. The jury learned that Brown threatened to harm Tampone because he stole $1,000 worth of crack cocaine from Brown. On December 31, 2012—the last day Tampone was seen alive—Brown rode with Tampone to Tampone's house and left with the Cadillac and cell phone. Though Brown claimed he acquired Tampone's property by peaceful means, the circumstances surrounding Tampone's death suggest otherwise. The jury learned that Tampone was proud of his Cadillac and did not lend it to anyone; Tampone died by a bullet wound to the back of the head; and the bullet lodged in Tampone's brain was fired from the same gun as the .25 caliber bullet in Smith's motel room wall, which did not fire from Smith's gun. From this evidence, a reasonable jury could determine that Brown's changing stories—that he borrowed the car or kept it as collateral—were not credible and conclude that Brown knowingly killed Tampone in order to take his property. We will not second-guess that credibility determination. See *Potts*, 304 Kan. 687, Syl. ¶ 1.

Third, the jury could reasonably conclude that the cell phone and Cadillac were taken from Tampone's "presence." Based on common experience and the evidence presented, the jury could infer that Tampone's cell phone was on his person or somewhere in his house, especially because Tampone was in frequent contact with drug dealers and his friend Haynes. Pursuant to *Evans* and *Pham*, shooting Tampone and taking his phone from the house constitutes taking it from his "presence." Thus, a jury could reasonably conclude that, "if not overcome by violence," Tampone would have retained possession of his cell phone. *Glymph*, 222 Kan. at 74-75.

Likewise, the evidence suggests the Cadillac was under Tampone's control at the time of the attack. Testimony revealed that Tampone usually parked his Cadillac on the street outside his house and Brown rode with Tampone in the Cadillac to Tampone's house on December 31, 2012. The jury could reasonably infer that, at the time Brown shot Tampone, the Cadillac was parked outside the house. Like the victims in *Glymph* and *Webster*, the property may not have been within Tampone's immediate vicinity, but it was still sufficiently under his control that "violence or intimidation [was] essential to sunder it." *Glymph*, 222 Kan. at 74. Indeed, the distance between Tampone and his car was not so great that he could not resist an attempt to steal it. See *Webster*, 54 Cal. 3d at 440.

Furthermore, no evidence suggests that Tampone's Cadillac was hotwired—the reasonable inference is that Brown took Tampone's car keys. Smith's girlfriend testified that on New Year's Day, Brown had Cadillac keys with him, and Brown told detectives that he dropped the Cadillac off at a park and left the keys inside it. Thus, the jury could reasonably conclude that, but for the attack, Tampone could have "take[n] effective physical steps to retain control of the vehicle, and to prevent defendant . . . from stealing it," whether by securing the keys or the vehicle itself. *Webster*, 54 Cal. 3d at 440.

Regarding the Rhone homicide, Brown argues the State presented insufficient evidence of attempted aggravated robbery and felony murder because "[t]here was no evidence as to what happened at the shooting of Shawn Rhone" besides Brown's confession. The root of Brown's concern appears to be the use of circumstantial evidence to substantiate Brown's admission that he knew about and participated in the plan to rob Rhone. However, we reiterate that "there is no distinction between direct and circumstantial evidence in terms of probative value." *Potts*, 304 Kan. at 694. We conclude the evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that Brown's associates orchestrated the robbery and fired the lethal shots—with Brown's help as the wheelman.

22

Because the State pursued a theory of accomplice liability, it had to prove that (1) Brown or another for whose conduct he was criminally responsible killed Rhone; and (2) the killing occurred while Brown or another whose conduct he is criminally responsible for was attempting to commit aggravated robbery. *State v. Netherland*, 305 Kan. 167, 178, 379 P.3d 1117 (2016); see K.S.A. 2012 Supp. 21-5402; K.S.A. 2012 Supp. 21-5210(a). Brown would be criminally responsible for the crimes against Rhone if he intentionally aided the perpetrators in attempting to commit aggravated robbery, meaning it was Brown's conscious objective to engage in such conduct. See K.S.A. 2012 Supp. 21-5210(a); K.S.A. 2012 Supp. 21-5202(h). We apply the same definition of aggravated robbery as before. See K.S.A. 2012 Supp. 21-5420(b).

We recently stated that "an attempt requires proof of three elements: the defendant's commission of any overt act toward the perpetration of a crime, the defendant's intention to commit the crime, and the defendant's failure to complete the crime." *Brown*, 303 Kan. at 1001; K.S.A. 2016 Supp. 21-5301(a). An overt act "necessarily must extend beyond mere preparations made by the accused and must approach sufficiently near to the consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense." *State v. Peterman*, 280 Kan. 56, 61, 118 P.3d 1267 (2005).

In cases of robbery, "it is a common practice for the principal participants at the scene of these crimes to have a 'wheel man', one who stays with the car in which the main participants plan to make their 'get-a-way'." *State v. Wilson*, 221 Kan. 359, 366, 559 P.2d 374 (1977). The "wheel man" intentionally aids and abets in the commission of the robbery and may be convicted of it although he did not participate at the scene of the crime or fire the fatal shot. 221 Kan. at 366; see *State v. Betancourt*, 301 Kan. 282, 305, 342 P.3d 916 (2015).

23

The State presented sufficient evidence that Brown's associates shot Rhone while attempting to execute a planned robbery, and Brown intentionally committed an overt act in furtherance of this plot by driving his associates to and from the scene of the crime. Ms. Brown testified that on the evening of Rhone's murder she saw Brown leave the house with his brothers in the Cadillac. Brown admitted that the group discussed robbing Rhone and his cousin arranged the meetup. Meanwhile, Rhone received a text directing him to 1757 Northeast Parkway, and he left to sell marijuana. Just after 7 p.m., witnesses heard gunshots on Northeast Parkway. Milo's GPS ankle bracelet placed him around 1757 Northeast Parkway at this time. Law enforcement later discovered shell casings and windshield glass fragments along the same street. Finally, Brown confessed that he participated as the wheelman, driving Milo and his cousin to and from this location.

Viewing such evidence in a light most favorable to the State, we hold the evidence was sufficient to convict Brown of all the crimes charged and affirm his convictions.

3. *The jury instructions were not clearly erroneous.*

Brown first contends the variance between the complaints and the jury instructions for the charges of Tampone's felony murder and Rhone's attempted aggravated robbery constitutes reversible error. He claims the court, in effect, constructively amended the complaints. As in *State v. Brown*, 299 Kan. 1021, 1036, 327 P.3d 1002 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016), we discern that the "overarching complaint" of such argument "is that the crime elements jury instructions were erroneous for failing to match the information."

Because Brown failed to object to the instructions at trial, the clearly erroneous standard of review applies. *State v. McClelland*, 301 Kan. 815, 827, 347 P.3d 211 (2015); K.S.A. 2012 Supp. 22-3414(3). We first determine whether the instructions were legally and factually appropriate, employing an unlimited review of the entire record. 301 Kan.

24

at 828. If error is found, "the defendant must firmly convince the court the jury would have reached a different result without the error." *State v. Solis*, 305 Kan. 55, 65, 378 P.3d 532 (2016).

For felony murder, the State initially charged Brown with unlawfully killing Tampone "in the commission of, attempt to commit, or flight from, an inherently dangerous felony, to wit: Sale of Cocaine" but later amended the information to include "Sale of Cocaine or Aggravated Robbery." The district court narrowed the jury instructions to include only aggravated robbery.

In *Brown*, we rejected a near identical claim that the district court erroneously narrowed a jury instruction without first amending the information. The information's charge of felony murder listed three alternative means for committing the underlying felony, but the jury instruction listed just one. However, the defendant—like Brown— falsely presupposed that "the jury must always be instructed on all alternative means contained in the charging document." 299 Kan. at 1037. As we explained:

> "Not only would it confuse the jury to be instructed on a means for which there was no trial evidence, it would violate the super sufficiency rule from *Wright*, which requires sufficient evidence 'to support each alternative means upon which a jury is instructed.' . . . Reversal for insufficient evidence in an alternative means case is avoided by the district court when it only instructs the jury on the means for which there was evidence presented at the trial. Indeed, we have encouraged trial judges to perform that gatekeeping function of matching the jury instructions to the evidence presented at trial." 299 Kan. at 1037.

Pursuant to *Brown*, we conclude the narrowed jury instructions for Tampone's felony murder were not erroneous. On the contrary, the court properly exercised its gatekeeping function by removing an alternative means that the evidence likely did not support. Thus, the felony-murder instruction was legally and factually appropriate.

For attempted aggravated robbery, the State charged Brown with committing "any overt act, to-wit: demanded drugs and cash, toward the perpetration of a crime, to-wit: Aggravated Robbery." The district court omitted "to wit: demanded drugs and cash" from the related jury instruction. Brown argues this instruction erroneously broadened the crime charged to include any overt act.

Generally, "[a] jury instruction on the elements of a crime that is broader than the complaint charging the crime is erroneous." *State v. Trautloff*, 289 Kan. 793, 802, 217 P.3d 15 (2009). Such error is excusable when the defendant's substantial rights are not prejudiced. 289 Kan. at 802. However, Brown does not explain how—and the record does not suggest that—the discrepancy between the information and the instruction deprived him of due process or impacted his substantial rights. For example, Brown does not argue he was unfairly surprised at trial when the State presented the theory that he served as wheelman instead of demanding drugs and cash. Furthermore, the instruction accurately stated the law as applied to the facts in this case. Therefore, we are not persuaded that this discrepancy—if error—amounts to reversible error.

Brown next argues the jury instruction defining "intent" to aid and abet attempted aggravated robbery is unconstitutionally vague. However, Brown proposed the exact intent instruction that the court ultimately gave to the jury and did not object to it. Thus, any alleged error was invited and we need not consider the claim further. See *State v. Sasser*, 305 Kan. 1231, 1236, 391 P.3d 698 (2017) ("when a defendant actively pursues what is later argued to be an error, then the [invited error] doctrine most certainly applies"); *State v. Logsdon*, 304 Kan. 3, 31, 371 P.3d 836 (2016) (For alleged jury instruction errors, "[t]he invited error doctrine applies only when the party fails to object *and* invites the error, unless the error is structural."); *State v. Angelo*, 287 Kan. 262, 280, 197 P.3d 337 (2008) ("A litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal.").

26

Finally, Brown loosely argues the jury instruction defining "reckless" criminal discharge of a firearm is irrational because "certain circumstances" is undefined. Because Brown failed to object to this instruction, we review it for clear error. See *McClelland*, 301 Kan. at 827. The district court instructed the jury that, for criminal discharge of a firearm, "[a] defendant acts recklessly when the defendant consciously disregards a substantial and unjustifiable risk that certain circumstances exist." This language comports with the statutory definition of reckless and the corresponding PIK. See K.S.A. 2012 Supp. 21-5202; PIK Crim. 4th 52.010 (2015 Supp.). Because Brown gives us no sound reason to doubt the rationality of this long-standing definition, we affirm.

Affirmed.

ROSEN, J., not participating.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 112,782 vice Justice Rosen under the authority vested in the Supreme Court by K.S.A. 20-2616.