NOT DESIGNATED FOR PUBLICATION

No. 113,876

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSEPH P. JONES, JR.,
*Appellant*.


MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed September 29, 2017. Affirmed in part, vacated in part, and remanded with directions.

*Heather Cessna*, of Kansas Appellate Defender Office, for appellant.

*Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before BRUNS, P.J., MCANANY and BUSER, JJ.


BUSER, J.: A jury found Joseph P. Jones, Jr. guilty of 19 counts of nonresidential burglary, one count of theft of a firearm, multiple counts of theft, and multiple counts of criminal damage to property. On appeal, Jones asserts a number of trial errors. Based on our review of the record, however, we find no reversible error. As the State concedes, the sentencing journal entry contains an error relating to Jones' misdemeanor convictions for criminal damage to property. As such we vacate that part of the journal entry and remand this case to the district court to enter a journal entry nunc pro tunc to correct the error. Thus, we affirm in part, vacate in part, and remand with directions.

1

On the night of May 13, 2014, and in the early morning hours of May 14, 2014, Jones broke into numerous businesses in Hutchinson. Jones was subsequently arrested and the State filed multiple felony and misdemeanor charges against him. Ultimately, he was convicted on all of the charges. We will briefly summarize the facts here and discuss additional facts as necessary in our analysis.

*The Reported Crimes*

*Poorman's Auto Supply*

At approximately 11:30 p.m. on May 13, 2014, Officer Todd Allen of the Hutchinson Police Department was dispatched to Poorman's Auto Supply in response to a burglary alarm at that location. Upon arriving at the scene, Officer Allen noticed that the "front door casing had been pried back, so the outside door [c]ould be opened without catching on the lock, and [he] could see inside there was a glass breakage on the interior door." The police notified an assistant manager of Poorman's, and the assistant manager came to the store around midnight. The assistant manager determined that an intruder had gained entry into Poorman's by prying open the foyer door and breaking the window on the inside door. The intruder had stolen a roll of quarters, and the store manager's .38 caliber pistol was also missing from a desk drawer.

*State Farm Insurance—Brandon Meyer*

Around the same time, the alarm system at a nearby State Farm Insurance office alerted the owner, Brandon Meyer, of a possible break-in. Meyer contacted the police department and reported the situation. When Meyer arrived at the office the next morning to meet with law enforcement, he noticed that someone had cut all of the utility wires on the outside of the building and pried open the back door; there was damage to the door

frame and the door itself. According to Meyer, it cost him approximately $700 to repair the damaged door. Although the intruder had rifled through the front desk area and moved paperwork around, it did not appear that anything was missing from the office.

*Hutchinson Income Tax and Financial Services*

When Guy Gann arrived at Hutchinson Income Tax and Financial Services on the morning of May 14, 2014, he noticed that the police were investigating a break-in at the nearby State Farm Insurance office. He then noticed that the back door at his business was broken. Gann flagged down a police officer and informed him that someone had forced open the back door of his business and had cut the phone lines. According to Gann, the intruder stole between $40 and $60 from his cash drawer and a "small tin of coins [that held] numerous silver dollars and silver halves." Additionally, it cost Gann approximately $500 to replace his damaged back door.

*Sara Lee Bakery*

On the morning of May 14, 2014, Richele Calvert received a phone call from the police informing her that the Sara Lee Bakery store where she worked had been vandalized. Upon arriving at the store, Calvert noticed the security alarm was blaring, the front door was ajar, its glass was broken, and there was "glass everywhere." Although nothing of value appeared to be missing from inside the bakery, the intruder had opened drawers in the manager's office and left the back door ajar. According to Calvert, it cost approximately $350 to repair the front door.

*Dahm Family Dentistry*

Dr. John Dahm received a telephone call around 3:30 a.m. on May 14, 2014, from his office's alarm company. He immediately went to his office, where he observed that the glass in the office's front outer doors was broken. Dr. Dahm and a police officer

3

entered the business and noticed a drop of what appeared to be blood near the reception desk. Although nothing was stolen from the office, it cost Dr. Dahm approximately $400 to repair the glass doors. The police officer took two swabs of the apparent blood droplet, and the police department sent the swabs to the Kansas Bureau of Investigation (KBI) for examination. Dr. Dahm later testified that it was office practice to clean the office at the end of every business day and that they would have noted if blood had been present when they were cleaning and removed it. Dr. Dahm further testified that Jones has never been one of his patients.

*The Strand Hair Salon*

On May 14, 2014, Darrell Miller, the coowner of The Strand hair salon was notified that someone had entered the salon without authorization. Consequently, Miller met a police officer at the salon to assess the situation. In doing so, he noticed that the glass on the salon's front door had been broken. In addition, he noticed damage to a metal door at the back of the salon. According to Miller, the door handle was broken, the lock was damaged, and there were shoe prints on the outside of the door. Additionally, someone had opened the salon's back window and kicked out the window screen. The police officer observed a footprint on the concrete portion of the window's ledge. Moreover, the police found a cloth glove approximately 100 yards behind the salon. The police department also sent the glove to the KBI for examination. According to Miller, the intruder stole approximately $5 from a soda machine. In addition, it cost approximately $1,500 to repair the front door, about $120 to replace the window screen, and around $2,400 to fix the damaged metal door.

*Papa Murphy's Pizza*

John Allen, who owned a Papa Murphy's Pizza franchise located nearby, received a phone call from a police dispatcher at approximately 4 a.m. on May 14, 2014. Papa

4

Murphy's is located in the same building as the Hutch Vapor shop and a State Farm Insurance office. The dispatcher advised Allen that his business had been broken into. When Allen and his wife went to the business, they found that it was not in the same condition it had been in when they closed it the previous evening. In particular, they found the glass on his south door was broken and the "clip" which is used to secure the back door had been removed. Although nothing was stolen from inside the business, it cost Allen approximately $400 to repair the damaged door. Allen also accessed video from his surveillance system showing the burglary in progress. He provided the video to the police department. This footage was later admitted into evidence at trial.

### Hutch Vapor Shop

Michael Depew, who owns and operates Hutch Vapor Shop, was notified around 3:30 a.m. on May 14, 2014, that his business—which is located in a suite next to Papa Murphy's Pizza—had been burglarized. Upon arriving at his shop, Depew discovered that someone had broken the front door. After gaining entry to the business, the intruder had pried open the cash register and stole around $200. The intruder also went into Depew's office, and about $200 was taken from a petty cash container. It cost Depew approximately $600 to repair the damage to the front door.

### State Farm Insurance—Andy Fry

Andy Fry, who owned a separate State Farm Insurance office in the same building as several of the other businesses discussed above, was notified by a police dispatcher of a potential burglary around 3:30 a.m. on May 14, 2014. Upon arriving at his office, Fry noticed that the front door had been pried open. The glass on the door had been shattered, and Fry noticed that the dead bolt had been pulled away from the door. Fry subsequently discovered that an intruder had stolen approximately $140 from a money box and from a

bank bag. In addition, it cost Fry around $900 to install new glass and window graphics on the damaged front door.

*Schroeder Family Chiropractic*

Police also notified Dr. Christopher Schroeder, who has an office located in the same building as some of the other businesses, of a possible burglary in the early morning hours of May 14, 2014. When Dr. Schroeder arrived at his office, he found that the glass in the front door had been shattered. Dr. Schroeder then discovered that the intruder had broken a light switch, rifled through the office's bank deposit bag and cashbox, and had stolen between $100 and $150 of petty cash. According to Dr. Schroeder, it cost him around $500 to repair the front door.

*Clear Choice Hearing*

During the early morning hours of May 14, 2014, the Hutchinson Police Department called Sara L. Hinsdale to inform her about a burglary at Clear Choice Hearing. When Hinsdale arrived at the business, she noticed that "someone had taken a crowbar or some device to pull the metal back" on the front door in order to gain entry. Although things were out of place inside the business, Hinsdale did not notice anything missing. It cost Clear Choice Hearing approximately $200 to repair the damage to the front door.

*Young Pediatric Dentistry*

Dr. Kricket C. Young was called by a member of her staff that her dental office had been broken into. Dr. Young went to her office and found it in disarray. Someone had used some form of tool to pry into the front door, which damaged the woodwork. She also found that all of the cabinets and desk drawers in the front office were open. Likewise, all of the desk drawers in Dr. Young's private office had been opened.

Although it appears that nothing was stolen from her office, it cost Dr. Young $488.83 to repair the damaged front door.

### *2500 North Main Street Building*

Jack Martin owns the commercial building in which several of the businesses discussed above were located. He was notified during the early morning hours of May 14, 2014, that a number of offices had been broken into. The building has a common area and each of the businesses has its own door and office space. Martin learned that the office suites leased to six different businesses had been burglarized. When he went to the building, he found damage to several doors. Martin had to replace an interior door that went into a common hallway as well as several other doors at a total cost of $2,700. Martin also paid $1,410 to replace the door and the frame for one of the businesses and paid $236 for minor repairs to other doors to businesses in the building. The various business owners in the 2500 North Main Street Building also testified as to damages to their companies beyond the doors repaired by their landlord, Martin.

### a. *Think Toner and Ink*

Sandra Linebarger, an employee of Think Toner and Ink, was called by a police dispatcher a little before 4 a.m. on May 14, 2014. The dispatcher informed Linebarger that someone had broken into Think Toner and Ink and requested her to come to the business. When Linebarger arrived at the office, she noticed that someone had "peeled back" the lock from the front door. Linebarger also found that the intruder had removed the cash drawer from the cash register and saw that one roll of dimes and one roll of quarters, worth a total of $7, was missing. Linebarger further observed that the back door, which leads into Star Lumber and Supply's storage room, was ajar. According to Linebarger, the door is locked at the close of business each day.

7

### b. *Midwest Hearing Aid Inc.*

Police called Kathy Hendershot, an employee of Midwest Hearing Aid Inc., at approximately 3:30 a.m. on May 14, 2014. She was informed that the business had been burglarized. Consequently, Hendershot went to Midwest Hearing Aid Inc. and found that the back door appeared to have been kicked in. The glass door that opened into a common hallway in the office building had a hole in the bottom, and the glass was shattered. After going through her business, Hendershot concluded that the intruder stole approximately $20 from a cash drawer.

### c. *Physical Therapy Consulting Services*

Terri Goss, the owner of Physical Therapy Consulting Services located within the commercial office building, arrived at work on the morning of May 14, 2014. At that time, she discovered that someone had kicked in the front door, breaking the door frame. Once inside the office, Goss discovered that someone had rifled through the contents of a small safe in the main office area, broke into a storage area, and went through a large cabinet that stored medical records. As far as she could tell, the intruder did not take anything from her business.

### d. *Allstate Insurance*

Anna Krehbiel is an Allstate Insurance agent who has an office located in the 2500 Main Street Building. A dispatcher contacted her at approximately 3:30 a.m. on May 14, 2014, and told her that someone had broken into her office. Upon arriving there, Krehbiel noticed that someone had pried the metal away from the lock on her door. After observing the broken door, Krehbiel went inside her office, where she discovered that $30 in cash and some quarters were missing from a cash box. Although Martin paid to replace the door, Krehbiel estimated that it would cost her between $500 and $600 to tint the new door and add her agency's signage.

8

### e. Star Lumber and Supply

Jerry Feldman, the owner of Star Lumber and Supply, received a call from one of his employees around 4:45 a.m. on May 14, 2014. The employee informed Feldman that there had been a burglary at the business. Feldman immediately went to his business and discovered that someone had "busted out the jam" of the door that connects his business to the next door business, Physical Therapy Consulting Services. Feldman noticed that the intruder had rifled through his desk drawer. A couple of weeks after the burglary, Feldman noticed that an LED flashlight—that he recalled seeing on his desk the day before the burglary—was missing.

### f. Shelter Insurance

Mike Davis, a Shelter Insurance agent, arrived at his office around 9 a.m. on the morning of May 14, 2014. He discovered that someone had broken into the office by kicking in or prying open a door, which is located off of a common hallway. When checking his office, Davis found everything in disarray. Davis explained, "[T]he door [was] kicked in, files had been rummaged through. My kid's pictures were on the floor. [The intruder] went through my desk drawers, took some stuff out. There were some blank business checks that were on the floor." Davis determined that a new cell phone, which had not yet been activated, was missing.

*The Police Investigation*

Following the string of burglaries, the Hutchinson Police Department assigned Detective Curtis Black to investigate. The detective quickly learned that the Papa Murphy's business had surveillance video of the burglary that occurred at that location. He obtained a copy of this footage from Allen as well as a copy of a surveillance video from a Kwik Shop located near Clear Choice Hearing. Subsequently, Detective Black

9

reviewed the Kwik Shop video and identified defendant Jones walking into the Kwik Shop at 4:17 a.m. on May 14, 2014.

Detective Black noticed the individual depicted in the two surveillance videos had numerous similarities. He testified the person in both videos wore clothing and shoes with identical markings and color. He also noted that the hairline on the man was the same in both videos and that the man was wearing only one glove in the video from the pizza shop.

Casey Slaughter, a supervisor at the Wichita Police Department, was subsequently asked to assist in the investigation. Slaughter's team evidently focused on serial property crimes and was available to assist other departments. Detective Black's office provided Slaughter with two photos of an individual they were attempting to locate. On May 30, 2014, Slaughter located Jones in Wichita.

During his investigation, Detective Black noticed that someone had cut phone lines located near the pizza and vapor shops. The detective also observed footprints in the gravel alleyway directly behind Papa Murphy's Pizza "just right out the back door area [and] within a couple feet of where the phone lines were cut." The detective took pictures and used a plaster cast to take an impression of the footprints. Black obtained a good copy of the footprints and recognized a "Nike swish and the full impression of the heel" from the impression.

The two swabs of what appeared to be blood found at John Dahm Family Dentistry was sent to the KBI for testing. The Department also sent the KBI the glove found behind the hair salon. The Department also forwarded swabs of DNA collected from the inside of Jones' mouth to the KBI for comparison.

10

KBI forensic scientists confirmed that the red droplets found at the dentist office was human blood. Moreover, it was determined that the DNA profile from the blood collected from the dentist office matched the DNA profile of Jones. KBI scientists also concluded that the profile of a major DNA contributor found in the glove was consistent with Jones' DNA profile.

*The Criminal Proceedings*

The State charged Jones with 19 counts of nonresidential burglary, 1 count of theft of a firearm, 1 count of criminal damage to property valued at $1,000 to $25,000, 7 counts of theft, and 11 counts of criminal damage to property valued at less than $1,000. Prior to trial, the State informed the district court that it planned to introduce testimony from Scott Burchard, Jones' parole officer with the Missouri Department of Corrections, and Todd King, a detective in the Springfield, Missouri police department. According to the State, Burchard and King both knew Jones and recognized him in the surveillance videos. In fact, they were the ones who identified Jones during Detective Black's investigation.

The State also announced its intention to elicit evidence—through the testimony of Burchard and King—that the burglaries committed in Hutchinson met Jones' known modus operandi. In particular, the State sought to introduce evidence that Jones was known as the "phone line burglar" because his "pattern of conduct" was to "cut the phone lines of businesses and then burglarize them [or commit] strip mall burglaries . . . by breaking the windows and stealing only cash." Jones' attorney objected to the introduction of this evidence. After considering the arguments of counsel, the district court concluded that Burchard and King could not testify about Jones' prior criminal acts. While the court held that the witnesses could be used to identify Jones from the videos, it could not testify about Jones' prior criminal convictions from Missouri.

On the morning of the second day of Jones' trial, his attorney raised additional objections to the anticipated testimony of Burchard and King regarding their identification of the individual on the two surveillance videos. The district court, however, agreed with the State's contention that Jones' objection was untimely because he failed to file a written motion prior to trial. In reaching this conclusion, the district judge cited K.S.A. 22-3216, which required a written motion prior to trial.

Jones renewed his objection later in the trial. After taking the matter under advisement, however, the district court overruled the objection, finding that Burchard and King would be allowed to testify about their identification of the person on the videos but would not be permitted to testify that they knew Jones based on his involvement in the criminal justice system in Missouri. Jones' attorney also subsequently objected to the men's testimony on the ground that allowing them both to testify as to the identity of the person on the videos would be cumulative. The district judge disagreed.

Subsequently, Burchard testified that he has been a resident of Springfield, Missouri, for approximately 15 years and that he had known Jones since November of 2012 and had spoken to him "approximately 30 or plus times." Burchard then testified that he recognized Jones on the surveillance videos. Likewise, King testified that he has been a resident of Springfield, Missouri, since about 1994 and had known Jones since 1998. He indicated that he is able to recognize Jones both in person and on video because he has had the opportunity to see him on several occasions. The State then showed him the video, and King identified the person depicted as Jones.

In addition, the State elicited the testimony of several other witnesses at trial. The State presented the DNA evidence taken from the blood droplet, and the glove was admitted into evidence, as was the plaster cast of the footprints found near the door of the burgled pizza shop. Law enforcement officers further testified that Jones was wearing "two white [Nike tennis] shoes, dark blue jeans and a black tank top" when he was

12

located. Although a forensic analysis was not performed on his shoes, Detective Black compared the plastic cast and the photographs of the alleyway footprints to photographs of the tennis shoes recovered from Jones. Black testified that "[t]hey are the exact same shoe print impressions and the Nike symbol, the tread wear; everything is the same." Moreover, Detective Black indicated that when he saw the shoes recovered from Jones, he knew those were the same shoes worn by the man in the Kwik Shop video and that left impressions in the gravel outside the Papa Murphy's store.

At the conclusion of the trial, the jury found Jones guilty on all of the charges. The district court subsequently sentenced him to a controlling 68-month prison term. The district court also sentenced Jones to a consecutive 12-month jail term, which was deemed to be satisfied due to the jail credit he had earned while awaiting trial. In a subsequent hearing, the district court ordered Jones to pay $8,109.81 in restitution. Thereafter, Jones timely appealed.

ANALYSIS

*Jury Nullification*

While Jones acknowledges that criminal defendants are not entitled to have the jury instructed on its inherent power of nullification, he contends that the district court erred by compelling the jury to convict him based on the reasonable doubt instruction the jurors were given. As Jones candidly concedes, he did not object to the district court's written instruction on reasonable doubt. A party cannot claim error for the district court's giving or failing to give a jury instruction unless (1) the party objects before the jury retires, stating distinctly the matter to which the party objects and the grounds for the objection; or (2) the instruction or the failure to give the instruction is clearly erroneous. *State v. Smyser*, 297 Kan. 199, 204, 299 P.3d 309 (2013). In the absence of a timely

13

objection, we review the reasonable doubt instruction given to the jury in this case under a clearly erroneous standard.

When determining whether an instruction was clearly erroneous, we first determine whether there was any error at all. In making this determination, we must consider whether the instruction was legally and factually appropriate based on a review of the entire record. If we find that the district court erred in giving a challenged instruction, then the court must determine whether we are firmly convinced that the jury would have reached a different verdict had the instruction error not been given. The party claiming a clearly erroneous instruction—in this case Jones—carries the burden of establishing the degree of prejudice necessary for reversal. *State v. Williams*, 295 Kan. 506, 515-16, 286 P.3d 195 (2012).

As found by this court in *Silvers v. State*, 38 Kan. App. 2d 886, 173 P.3d 1167, *rev. denied* 286 Kan. 1180 (2008), jury nullification is:

> "'A jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness.' [Citation omitted.]" 38 Kan. App. 3d at 888.

Jury nullification is always a possibility because there is nothing prohibiting a jury from acquitting a defendant if it desires to do so. The Kansas Supreme Court, however, has expressly disapproved of the use of a jury nullification instruction that tells jurors that they may "do what they think is fair" or that they are entitled to act upon their conscientious feelings as to a fair outcome and to acquit the defendant if they believe justice requires such a result. See *State v. Naputi*, 293 Kan. 55, 65-67, 260 P.3d 86 (2011) (citing *State v. McClanahan*, 212 Kan. 208, Syl. ¶ 3, 510 P.2d 153 [1973]). On the other hand, jury instructions cannot forbid a jury from exercising its power of nullification nor

14

can they "compel a jury to convict, even if it finds all elements proved beyond a reasonable doubt." *State v. Smith-Parker*, 301 Kan. 132, 164, 340 P.3d 485 (2014).

Here, the district court properly instructed the jury about its role and about the State's burden of proof. In particular, the instructions described the jury's function and duty in a manner consistent with K.S.A. 22-3403(3). This statute states: "When the trial is to a jury, questions of law shall be decided by the court and issues of fact shall be determined by the jury." Likewise, the district court's instructions are consistent with K.S.A. 2016 Supp. 60-247(d), which provides that "[t]he jurors must swear or affirm to try the case conscientiously and return a verdict according to the law and the evidence."

Jones also acknowledges that the reasonable doubt instruction the district court provided the jury is identical to PIK Crim. 4th 51.010 (2012 Supp.). Jones argues, however, that it was legally inappropriate for the district court to utilize the PIK instruction because its use of the word "should"—rather than "may"—requires a jury to always find a defendant guilty if the elements of the crime charged are proven beyond a reasonable doubt. We disagree.

We note numerous opinions of this court have rejected the argument that the use of the word "should" in PIK Crim. 4th 51.010 prohibits a jury from exercising the power of nullification. See *State v. Allen*, 52 Kan. App. 2d 729, 733-36, 372 P.3d 432 (2016); see also *State v. Cuellar*, No. 112,535, 2016 WL 1614037, at *1-2 (Kan. App. 2016) (unpublished opinion), *rev. denied* 306 Kan. ____ (April 17, 2017); *State v. Jones*, No. 111,386, 2015 WL 4716235, at *5-6 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. 1080 (2016). As can be seen from a review of these cases, our court has consistently found:

"[T]he instruction at issue here 'does not upset the balance between encouraging jury nullification and forbidding it. . . . [U]nlike the words must, shall, and will, the word should does not express a mandatory, unyielding duty or obligation; instead, it merely denotes the proper course of action and encourages following the advised path.' *Hastings*, 2016 WL 852857, at *4." *Allen*, 52 Kan. App. 2d at 735.

For these reasons, we conclude that the district court did not commit error in instructing the jury regarding reasonable doubt.

*Failure to Give Eyewitness Identification Instruction*

Next, Jones contends that the district court erred when it failed to give the jury an instruction regarding the various factors jurors should consider in weighing eyewitness reliability as found in PIK Crim. 4th 51.110 (2013 Supp.). In particular, Jones asserts that an eyewitness identification instruction should have been given because Depew—the owner of the Hutch Vapor Shop—testified that he believed Jones was the person he saw on the surveillance video taken during the burglary of Papa Murphy's Pizza. Jones admits, however, that he did not object to the district court's failure to give an eyewitness identification instruction. As such, we review the failure to give this instruction under the clear error standard of review set forth in the previous section of this opinion.

A district court should normally give a PIK Crim. 4th 51.110 instruction "'in any criminal action in which *eyewitness identification* is a critical part of the prosecution's case and there is serious question about the reliability of the identification.' [Citations omitted.]" (Emphasis added.) *State v. Duong*, 292 Kan. 824, 836, 257 P.3d 309 (2011). Consequently, our Supreme Court has outlined five factors—known as the *Saenz* factors—for the purpose of determining whether there was a question about the reliability of an eyewitness identification. See *State v. Saenz*, 271 Kan. 339, 354, 22 P.3d 151 (2001). These factors include:

16

"'(1) the opportunity of the witness to view the defendant at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior descriptions of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.'" *Duong*, 292 Kan. at 836.

All of these factors relate to someone who observes a crime in progress or shortly thereafter—for example, observing someone running from the scene of a crime.

Here, we find that a PIK Crim. 4th 51.110 instruction was neither legally nor factually appropriate. There was no allegation that Depew was an eyewitness to the crimes or that he observed Jones shortly after the crimes were committed. Instead, Depew simply offered a lay opinion as to the identity of the individual he believed was depicted on the surveillance video from the pizza shop. Furthermore, Depew admitted that he had no direct knowledge regarding who burglarized his business because he was not present at the scene. Instead, he testified that the basis for his belief was his observation of both the video and seeing Jones in the courtroom. Moreover, Jones did not object to Depew rendering his opinion. Under all these circumstances, it was not clearly erroneous for the district court to fail to give an eyewitness identification instruction to the jury.

*Multiplicity*

Jones further contends that his conviction for burglarizing the building located at 2500 North Main Street, which is owned by First Choice Leasing, and his convictions for burglarizing several businesses leasing space in that building were multiplicitous. As such, he argues that his convictions for these charges violated K.S.A. 2013 Supp. 21-5807(a)(2) and the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. Questions involving multiplicity are questions of law subject to unlimited appellate review. *State v. Belt*, 305 Kan. 381, 407, 381 P.3d 473 (2016).

17

Multiplicity is the charging of a single offense as more than one count on a charging document. *State v. Pham*, 281 Kan. 1227, 1246, 136 P.3d 919 (2006). However, Jones did not raise this issue below and—as a general rule—we do not consider issues for the first time on appeal. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). As Jones correctly points out, however, appellate courts have entertained multiplicity challenges for the first time on appeal "'to serve the ends of justice [or] prevent a denial of fundamental rights.' [Citation omitted.]" See *State v. Kleypas*, 305 Kan. 224, 258, 382 P.3d 373 (2016); *State v. Weber*, 297 Kan. 805, 809, 304 P.3d 1262 (2013). Because multiplicity presents a purely legal question in this case and Jones' right to a fair trial is involved if he has been punished more than once for the same crime, we will consider this issue on the merits. See *State v. Appleby*, 289 Kan. 1017, 1026, 221 P.3d 525 (2009); *State v. Walker*, 283 Kan. 587, 609, 153 P.3d 1257 (2007).

Determining whether convictions are multiplicitous involves two steps. First, we must determine whether the convictions arise from the same conduct. If they do, then we examine the statute or statutes under which a defendant has been convicted to determine whether the legislature intended to allow more than one unit of prosecution. *State v. Schoonover*, 281 Kan. 453, 496, 133 P.3d 48 (2006). To determine whether the convictions arise from the same conduct, we are to consider a variety of factors, such as whether the acts occurred at or around the same time or in the same place, as well as whether the acts were motivated by some fresh impulse. To determine if the legislature intended to allow more than one unit of prosecution, the language of the statute controls. 281 Kan. at 496-97.

Here, all of the charges that Jones contends are multiplicitous are burglaries committed at the 2500 North Main Street building. Although it is unclear how long Jones was in each business, the record on appeal suggests that each of the break-ins was committed close to the same time as Jones moved from one office to the next. Arguably,

18

he was motivated by a fresh impulse as he broke into each business as the evidence suggests he hoped to find more money or other items to steal.

Regardless, Jones was convicted under the same statute—K.S.A. 2013 Supp. 21-5807(a)(2)—that makes it illegal for a person to enter into any building or other structure that is not a dwelling without authority in order to commit theft. Because the plain language of the statute refers to any "building . . . or other structure" this court has previously held that the legislature intended that a person can be charged separately for each building or structure that is burglarized. Moreover, as this court has previously found, leased portions of a building that are separately enclosed and secured are to be treated as separate buildings or structures in burglary cases. See *State v. Parker*, 48 Kan. App. 2d 68, 84-85, 282 P.3d 643 (2012), *rev. denied* 297 Kan. 1254 (2013) (hospital room is temporarily leased to patients and designed to protect occupants' privacy and security; entry into room with intent to commit a crime is sufficient to support burglary charge, even if defendant did not unlawfully enter into hospital); see also *Bedard v. State*, 118 Nev. 410, 414, 48 P.3d 46 (2002) (burglary of separate office suites within same office building not multiplicitous); *State v. Foster*, No. 113,883, 2016 WL 4500953, at *4 (Kan. App. 2016) (unpublished opinion) (entry into private apartment within home constituted an unlawful entry, even if defendant had permission to enter home in which apartment was located), *rev. denied* 306 Kan. ____ (2017).

Here, each of the businesses that leased office space from First Choice Leasing had its own door as well as other features intended to exclude others from entry into the respective businesses and to protect the security of each company's separate property. Because each of the businesses had its own space and was secured separately from the other businesses in the building, we conclude that for the purposes of the burglary statute, each of the individual businesses was a distinct structure from the building in which it was located. See *State v. Vinyard*, 32 Kan. App. 2d 39, 42-43, 78 P.3d 1196 (2003). Thus, the burglary charges were not multiplicitous and the district court did not err in allowing

19

each unit of prosecution to be presented to the jury to determine whether Jones was guilty beyond a reasonable doubt.

*Sufficiency of Evidence*

In the alternative, Jones argues that if he could be charged with burglarizing each of the individual businesses in the 2500 North Main Street building, the State's evidence was insufficient to establish that he burglarized First Choice Leasing. When the sufficiency of evidence is challenged in a criminal case, this court reviews all of the evidence in the light most favorable to the State, and the conviction(s) will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). In determining whether there is sufficient evidence to support a conviction, the appellate court generally will not reweigh the evidence or assess the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

In order to prove that Jones was guilty of burglarizing the building owned by First Choice Leasing, the State was required to show that he entered into the building located at 2500 North Main Street without authority with the intent to commit theft. K.S.A. 2013 Supp. 21-5807(a)(2). In this case, the State presented evidence that Jones entered into the building's common area—which was locked—without authority. It also presented circumstantial evidence that the reason he entered into the building was to commit theft because once inside, he illegally accessed businesses located within the building and stole property from them. Kansas law clearly establishes that a burglary conviction does not require proof that the defendant actually completed a theft after an unlawful entry. See *State v. Potts*, 304 Kan. 687, 697, 374 P.3d 639 (2016). The criminal intent necessary to support a burglary conviction "'is rarely susceptible of direct proof; it is usually inferred from the surrounding facts and circumstances.'" *State v. Hargrove*, 48 Kan. App. 2d 522, 565-66, 293 P.3d 787 (2013). Based upon the entire record before the jury, it could

20

reasonably infer Jones unlawfully entered the premises possessed by First Choice Leasing to commit a theft, even if ultimately no property was taken from the common areas under First Choice Leasing's control.

*Identification Witnesses*

Jones also contends that the district court improperly admitted evidence that invaded the province of the jury when it allowed Burchard and King to opine that he was the individual depicted on the Kwik Shop surveillance video. In determining whether a district court abused its discretion in the admission of evidence, we first determine if the evidence is relevant. If so, we then determine if—under the applicable rules of evidence—whether the evidence is admissible and whether the probative value of the evidence is substantially outweighed by the potential for undue prejudice. *State v. Everett*, 296 Kan. 1039, 1044, 297 P.3d 292 (2013).

As a general rule, all relevant evidence is admissible. K.S.A. 60-407(f). According to K.S.A. 60-401(b), relevant evidence is that having "any tendency in reason to prove any material fact." Moreover, evidence is material when the fact it supports is in dispute and is significant under the substantive law of the case. *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016). "Evidence is probative if it furnishes, establishes, or contributes toward proof.'" *McCormick*, 305 Kan. at 47.

In the present case, identification of the person depicted in the surveillance videos was relevant, material, and probative because Jones denied that he was the person who committed the burglaries. Thus, the identity of the burglar was in issue. Likewise, the Kwik Shop video was taken near the estimated time of the burglaries and in a store located very close to the burglaries.

District courts have broad discretion as to whether to allow a witness to offer his or her opinion on a matter. *State v. Lowrance*, 298 Kan. 274, 293, 312 P.3d 328 (2013). Under K.S.A. 2016 Supp. 60-456(a), a lay witness may render an opinion if it is rationally based on the witness' perception, is helpful to understanding the witness' testimony, and is not based on scientific or technical knowledge. As long as the opinion testimony satisfies these criteria, it is admissible even if "it embraces the ultimate issue or issues to be decided by the trier of the fact." K.S.A. 2016 Supp. 60-456(d).

A review of the record reveals that both Burchard and King were personally acquainted with Jones and had known him for a number of years prior to the burglary. As such, they had information that would not be readily available to jurors simply by observing Jones sitting in the courtroom during his trial. This evidence was particularly helpful to the jury because it appears from the record that Jones had changed his appearance between the time the crimes were committed and the time of trial.

Hence, Burchard and King were able to offer valuable information based on their personal perception during the investigation of the burglaries and at trial due to their familiarity with Jones' physical characteristics. See *United States v. Fulton*, 837 F.3d 281, 297 (3d Cir. 2016) (opinion testimony regarding challenged identifications is permissible where the witness has had sufficient contact with the defendant to achieve a level of familiarity that renders the testimony helpful to the jury); *United States v. Beck*, 418 F.3d 1008, 1015 (9th Cir. 2005) (probation officer who had multiple prior contacts with the defendant was permitted to testify regarding his opinion that the person depicted in a bank surveillance photograph was the defendant); see also *Moreland v. State*, 207 Md. App. 563, 573, 53 A.3d 449 (2012). As such, the testimony given by Burchard and King is admissible under K.S.A. 2016 Supp. 60-456.

22

Finally, we note that the district court protected Jones from undue prejudice by prohibiting the State from eliciting testimony regarding how Burchard and King knew Jones. Furthermore, the district court prohibited the State from introducing any evidence of Jones' prior criminal conduct. Ultimately, the jurors were free to agree or disagree with the Missouri witnesses' opinions if they were not convinced that Jones was the person they saw on the surveillance video played during the trial. In addition, we do not find the admission of this opinion testimony to be unduly prejudicial because—as indicated above—Depew provided similar testimony without objection from Jones. Therefore, we do not find that the district court erred in admitting the opinion testimony of Burchard and King.

*Sentencing Journal Entry*

In addition, Jones points out that the journal entry of sentencing incorrectly reflects the sentences the district court handed down for his two misdemeanor convictions for criminal damage to property. As the State concedes, the district court pronounced a sentence of 6 months on each of these convictions to run concurrent to Jones' other sentences. However, the journal entry of sentencing reflects a sentence of 12 months' jail time on each of those misdemeanor convictions.

A sentence is effective when pronounced from the bench. *State v. Tafoya*, 304 Kan. 663, 666, 372 P.3d 1247 (2016). Furthermore, a journal entry that imposes a sentence at variance with the sentence pronounced from the bench is erroneous and must be corrected to reflect the actual sentence imposed. *State v. Mason*, 294 Kan. 675, 677, 279 P.3d 707 (2012). As such, we find that it is appropriate to vacate that portion of Jones' sentence that relates to the two misdemeanor convictions for criminal damage to property and to remand this case to the district court for entry of a nunc pro tunc journal entry to correct the error.

23

*Cumulative Error*

Finally, Jones contends that cumulative trial errors require the reversal of his convictions. When conducting a cumulative error analysis, appellate courts aggregate "'all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect on the outcome of the trial is such that collectively they cannot be determined to be harmless.' [Citation omitted.]" *State v. Fisher*, 304 Kan. 242, 263, 373 P.3d 781 (2016). In other words, the question becomes whether the totality of the circumstances substantially prejudiced the defendant and deprived him or her of a fair trial. 304 Kan. at 263. "'No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' [Citations omitted.]" *State v. Williams*, 303 Kan. 585, 604, 363 P.3d 1101 (2016).

Based on our review of the record, we do not find cumulative error in this case. Other than the sentencing error regarding the two misdemeanor convictions, we have found no error. This sentencing error can be simply remedied by the entry of a journal entry nunc pro tunc. See *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009) ("One error is insufficient to support reversal under the cumulative effect rule.").

Even if we had found other errors in this case, we conclude that the evidence presented against Jones at trial is sufficiently compelling to establish any other error was harmless. The evidence presented included DNA evidence from blood left at the scene of one of the crimes, DNA evidence taken from a glove left near one of the crime scenes, and surveillance videos. Accordingly, even if we found more than one error, we would not find that the cumulative effect resulted in an unfair trial.

24

CONCLUSION

Although there are no perfect trials, we are convinced that the district court made sure that Jones received a fair trial. Furthermore, based on our review of the record in this case, we conclude that the evidence supporting Jones' guilt was more than sufficient to support his convictions. We, therefore, affirm his convictions, vacate that portion of his sentence relating to his misdemeanor convictions for criminal damage to property, and remand this case to the district court for entry of a nunc pro tunc journal entry.

Affirmed in part, vacated in part, and remanded with directions.